**AMERICAN HORSE PROTECTION ASSOCIATION, INC., Appellant,**

v.

**Richard E. LYNG, Secretary, U.S. Department of Agriculture.**

**No. 85–6166.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1986.

Decided Feb. 24, 1987.

Russell J. Gaspar, Washington, D.C., for appellant.

Patricia D. Carter, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before STARR and WILLIAMS, Circuit Judges, and GREEN,* District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

The American Horse Protection Association (the "Association") appeals from a grant of summary judgment to the Secretary of Agriculture in its challenge to regulations under the Horse Protection Act, 15 U.S.C. §§ 1821–1831 (1982) (the "Act"). We find that summary judgment was inappropriate in view of the Secretary's failure to offer a satisfactory explanation of his refusal to institute rule making proceedings.

## I. BACKGROUND

The regulations at issue concern the practice of deliberately injuring show horses to improve their performance in the ring. This practice, called soring, may in-

* Of the United States District Court for the District of Columbia, sitting by designation pursu-

ant to 28 U.S.C. § 292(a).

volve fastening heavy chains or similar equipment, called action devices, on a horse's front limbs. As a result of wearing action devices, the horse may suffer intense pain as its forefeet touch the ground. This pain causes it to adopt a high-stepping gait that is highly prized in Tennessee walking horses and certain other breeds. *See generally* H.R.Rep. No. 1174, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S. Code Cong. & Admin.News 1696, 1699 (Soring "causes the animal to quickly lift its feet and thrust them forward. Also, the horse reaches further with its hindfeet in an effort to take weight off its front feet, thereby lessening the pain."). In the Horse Protection Act, Congress sought to end this practice by forbidding the showing or selling of sored horses. 15 U.S.C. §§ 1821–1824. Exercising broadly phrased rulemaking power under 15 U.S.C. § 1828, the Secretary issued regulations that prohibited soring devices and other soring methods in both general and specific terms. The general prohibition, 9 C.F.R. § 11.2(a) (1986), states

> Notwithstanding the provisions of paragraph (b) of this section [containing specific prohibitions], no chain, boot, roller, collar, action device, nor any other device, method, practice, or substance shall be used with respect to any horse at any horse show, horse exhibition, or horse sale or auction if such use causes or can reasonably be expected to cause such horse to be sore.

The regulations' specific prohibitions include the use of chains weighing more than eight or ten ounces (depending on the age of the horse), rollers weighing more than fourteen ounces, and certain padded shoes on young horses. *Id.* § 11.2(b). Lighter chains and rollers are not specifically prohibited.

Use of action devices in violation of either the general or specific prohibitions is unlawful under 15 U.S.C. § 1824(7) and may subject the violator to both criminal and civil penalties under 15 U.S.C. § 1825. Under the general prohibition, however, there is no penalty unless the use of the

device is shown to have caused soreness or the device can "reasonably be expected to cause" soreness. Use of pain killers may make detection of actual soring difficult. *See* H.R.Rep. No. 1174, 94th Cong., 2d Sess. 4, 11, *reprinted in* 1976 U.S.Code Cong. & Admin.News 1696, 1699, 1706. The regulations give no guidance as to when a device not specifically prohibited may reasonably be expected to cause soreness. There are no such definitional difficulties, of course, when a violation involves a device specifically prohibited.

The Association here contends that developments since these regulations were originally promulgated have demonstrated their inadequacy and that, accordingly, the Secretary should revise them in a new rulemaking. In fact, in its original rulemaking the agency made quite clear its recognition that the premises for not enacting broader specific prohibitions might erode. In its notice of proposed rulemaking, it stated that it relied on evidence from three test clinics which appeared to exonerate action devices weighing less than those that it proposed to forbid. 43 Fed.Reg. 18,514, 18,516–17 (1978). When the final rule was issued, the agency stated that it would consider prohibiting all action devices and padded shoes if the practice of soring continued. 44 Fed.Reg. 25,172, 25,173–74 (1979). At the same time it also mentioned that the agency had recently commissioned "a study of soring methods and techniques at a major university" that might eventually result in further changes in the regulations. *Id.* at 25,174.

This study was conducted at the Auburn University School of Veterinary Medicine between September 1978 and December 1982. Joint Appendix ("J.A.") at 32. The Auburn study evaluated use of eight- and ten-ounce chains and fourteen-ounce rollers—devices that the agency had declined to prohibit on the grounds that they did not cause soring when properly used under actual training conditions. 43 Fed. Reg. at 18,516–17. The study concluded that ten-ounce chains caused lesions, bleeding, edema,[1] and inflammation. J.A. at 38–

---

**1.** "[A]n abnormal excess accumulation of serous    fluid in connective tissue or in a serous cavity—

39. It also considered the effects of eight- and ten-ounce chains and fourteen-ounce rollers on scarred horses, and found that these devices caused raw lesions. *Id.* at 43–46. The effects of these devices thus fell within the statutory definition of sore. 15 U.S.C. § 1821(3) ("The term 'sore' when used to describe a horse means that [as a result of any substance or device used on a horse's limb] such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving...."). In tests of two-, four-, and six-ounce chains, however, the study found no harmful effects. J.A. at 46. The Auburn study also made preliminary findings on the effects of padded shoes, suggesting they caused problems not suspected at the time of the initial rulemaking. *Compare* J.A. at 48–50 *with* 44 Fed.Reg. at 25,174. The Association relies on these results in challenging the Agriculture Department's regulations.

Even before the Auburn study was completed, however, the agency considered revising its regulations on action devices. In a May 1981 letter to the Administrator of the Animal and Plant Health Inspection Service ("APHIS"), the Agriculture Department's Office of General Counsel recognized that soring had not been eliminated and argued that the gaps in the regulations were "undermining the Department's ability to achieve effective enforcement of the law and ... preventing the attainment of the goal Congress ha[d] set." J.A. at 73. The letter cited administrative cases interpreting the regulations to allow soring with "legal" action devices, *i.e.,* those not covered by the specific prohibitions. J.A. at 73–75.

Bureaucratic activity surged briefly, then ebbed. The Administrator of APHIS endorsed the letter from the Office of General Counsel, "OGC's comments make sense," and asked his staff for recommendations on possible changes. J.A. at 73, 77. In early 1982, representatives of the Association met with the Administrator to propose a ban on all action devices and pads.

*See id.* at 88. In March, the Administrator informed the group by letter that the agency's Veterinary Services staff had already prepared a justification for such a ban and was currently drafting a proposed rulemaking to implement it. *Id.* In July, he confirmed that such regulations had been drafted and that the agency had intended to publish the proposals "as soon as possible." *Id.* at 89. But, he reported, these plans were now being held in abeyance in order to observe the "self-regulation efforts of the industry." *Id.*

In March 1984, agency officials met with representatives of the walking horse industry, the Association, and others to discuss enforcement of the Act. The Association again requested a rulemaking. *Id.* at 85–86. In a letter to the Association discussing this meeting, the Deputy Administrator of Veterinary Services wrote, "The apparent inconsistency of the current regulations regarding the weight of action devices with the law and research performed at Auburn University has been a matter of concern for Veterinary Services and the Office of the General Counsel for some time." *Id.* at 90. Nevertheless, he reported that the agency would withhold publication of the proposed rule pending further studies by the industry. *Id.* He also reported the industry representatives' remark "that the allowable weight of action devices could not be lowered and still retain the desired gait." *Id.* Perhaps supposing that industry approval was required for any change in the regulations, the Deputy Administrator said, "We are ... disappointed that no consideration has been given to restricting the weight of action devices." *Id.*

## II. THE STANDARD OF REVIEW

The reviewability of a refusal to institute a rulemaking has been a source of some uncertainty since the Supreme Court held refusals to take ad hoc enforcement steps presumptively unreviewable in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). *See Oil, Chemical and Atomic Workers International Union v. Zegeer,* 768 F.2d 1480, 1484 (D.C.Cir.

called also *dropsy....*" Webster's Ninth New

Collegiate Dictionary (1985).

1985). Although the Court expressly noted that *Chaney* did not "involve the question of agency discretion not to invoke rulemaking proceedings," 470 U.S. at 825 n. 2, 105 S.Ct. at 1652 n. 2, its reasoning applies to some extent to a refusal to institute a rulemaking. Our examination of *Chaney* persuades us, however, that it does not bar review of the agency's decision here.

The *Chaney* Court relied on three features of nonenforcement decisions in arriving at its negative presumption. First, such decisions require a high level of agency expertise and coordination in setting priorities. *See id.* at 831–32, 105 S.Ct. at 1655–56. Second, the agency in such situations will not ordinarily be exercising "its *coercive* power over an individual's liberty or property rights." *Id.* at 832, 105 S.Ct. at 1656 (emphasis in original). Third, such nonenforcement decisions are akin to prosecutorial decisions not to indict, which traditionally involve executive control and judicial restraint. *Id.* The first and second of these features are likely to be involved in an agency's refusal to institute a rulemaking, but the third is another matter.

*Chaney* says little about this third feature. To a degree, of course, it recapitulates and underscores the prior points about resource allocation and non-coercion. The analogy between prosecutorial discretion and agency nonenforcement is strengthened, however, by two other shared characteristics. First, both prosecutors and agencies constantly make decisions not to take enforcement steps; such decisions thus are numerous. Second, both types of nonenforcement are typically based mainly on close consideration of the facts of the case at hand, rather than on legal analysis. Refusals to institute rulemakings, by contrast, are likely to be relatively infrequent and more likely to turn upon issues of law. This analysis of the third *Chaney* feature finds support in the Court's distinguishing of cases where an agency "has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n. 4, 105 S.Ct. at 1656–57 n. 4. Such abdications are likely both to be infrequent and to turn on

matters remote from the specific facts of individual cases.

Furthermore, the Administrative Procedure Act ("APA") serves to distinguish between *Chaney* nonenforcement decisions and refusals to institute rulemakings. The *Chaney* Court noted that "when an agency *does* act to enforce, that action itself provides a focus for judicial review" since a court can "at least ... determine whether the agency exceeded its statutory powers." 470 U.S. at 832, 105 S.Ct. at 1656 (emphasis in original). APA provisions governing agency refusals to initiate rulemakings give a similar focal point. The APA requires agencies to allow interested persons to "petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e) (1982), and, when such petitions are denied, to give "a brief statement of the grounds for denial," *id.* § 555(e). These two provisions suggest that Congress expected that agencies denying rulemaking petitions must explain their actions.

Thus, refusals to institute rulemaking proceedings are distinguishable from other sorts of nonenforcement decisions insofar as they are less frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation. *Chaney* therefore does not appear to overrule our prior decisions allowing review of agency refusals to institute rulemakings.

The District Court was thus correct in finding that this case requires a determination of whether the Secretary's failure to act was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A) (1982). *American Horse Protection Association v. Block*, No. 84–3298, mem. op. at 14 (D.D.C. Oct. 30, 1985) (hereinafter *AHPA* ), J.A. at 16, 29. Review under the "arbitrary and capricious" tag line, however, encompasses a range of levels of deference to the agency, *see WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C.Cir.1981), and *Chaney* surely reinforces our frequent statements that an agency's refusal to institute rulemaking proceedings is at the high end of

the range, *see ITT World Communications, Inc. v. FCC,* 699 F.2d 1219, 1245–46 (D.C.Cir.1983), *rev'd on other grounds,* 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984); *Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1221 (D.C.Cir.1983). Such a refusal is to be overturned "only in the rarest and most compelling of circumstances," *WWHT,* 656 F.2d at 818, which have primarily involved "plain errors of law, suggesting that the agency has been blind to the source of its delegated power," *State Farm Mutual Automobile Insurance Co. v. Department of Transportation,* 680 F.2d 206, 221 (D.C.Cir.1982), *vacated on other grounds,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

In these, as in more typical reviews, however, we must consider whether the agency's decisionmaking was "reasoned." *See Professional Drivers Council,* 706 F.2d at 1220. *See also id.* at 1220–21 (the court must assure itself that the agency considered the relevant factors, that it explained the "facts and policy concerns" relied on, and that the facts have some basis in the record). *Cf. Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 52, 103 S.Ct. 2856, 2871, 77 L.Ed.2d 443 (1983) (considering rule rescission to determine whether it was "the product of reasoned decisionmaking").

Finally, a refusal to initiate a rulemaking naturally sets off a special alert when a petition has sought modification of a rule on the basis of a radical change in its factual premises. In *Geller v. FCC,* 610 F.2d 973 (D.C.Cir.1979), the regulations at issue had been adopted expressly to facilitate passage of certain legislation, but even after Congress adopted the legislation the agency refused to reconsider them. *Geller* was later summarized by this court as holding that "an agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject (either to promulgate or not to promulgate specific rules) has been removed." *WWHT,* 656 F.2d at 819. The Association argues that this principle applies here.

### III. The Agency's Reasoning

In considering a refusal to grant a rulemaking petition, the court must examine "the petition for rulemaking, comments pro and con ... and the agency's explanation of its decision to reject the petition." *See id.* at 817,–18. The record before us contains no formal rulemaking petition, but we have no difficulty in characterizing the Association's requests for action as such. Neither the Agriculture Department's regulations, *see* 7 C.F.R. § 1.28 (1986), nor the Administrative Procedure Act, *see* 5 U.S.C. § 553(e) (1982), specifies any formalities for a rulemaking petition. Furthermore, the correspondence from agency officials to Association representatives demonstrates that the agency understood the group's requests to be petitions. *See* J.A. at 88 (letter from Administrator of APHIS referring to agency discussion of the Association's "recommendation that proposed rulemaking ... be published in the Federal Register as soon as possible.").

The agency's explanation for its refusal to proceed with the rulemaking is contained in its correspondence with the Association (discussed below) and in the two litigation affidavits of the Deputy Administrator of Veterinary Services of the APHIS. *Id.* at 99, 101. In response to the claim that the Auburn study presented new facts that merited a new rulemaking, the Deputy Administrator's first affidavit stated:

6. I have reviewed studies and other materials, relating to action devices, presented by humane groups, Walking Horse industry groups, and independent institutions, including the study referred to in the Complaint.

7. On the basis of this information, I believe that the most effective method of enforcing the Act is to continue the current regulations.

*Id.* at 100. The second affidavit cites statistics indicating that the agency wrote up a generally diminishing number of alleged violations over the period beginning in 1979 and ending in 1984, although the number of horses exhibited and examined did not generally decline. *Id.* at 101–02.

On the basis of the litigation affidavits, the District Court found that "the agency has provided a rational basis for its conclusion not to regulate...." *AHPA* at 13, J.A. at 28. We cannot agree. The two conclusory sentences quoted above are insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decisionmaking. *See Motor Vehicle Manufacturers,* 463 U.S. at 52, 103 S.Ct. at 2871. There is no articulation of "the factual and policy bases for [the] decision." *Professional Drivers,* 706 F.2d at 1221. We are adjured to take a critical view of an agency's "post hoc rationalization," *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 826, 28 L.Ed.2d 136 (1971), but under even the most charitable view the agency's post hoc conclusory statement lacks substance. Nor do the figures on reduced findings of violations suffice. These are apparently intended to suggest that soring is being eliminated by dint of agency efforts. Litigation affidavits of Association members suggest, however, that soring continues to be widespread. *See* J.A. at 79–81, 95, 97–98. Furthermore, the agency's correspondence with the Association (which was not discussed by the District Court) casts doubt on the agency's benign interpretation of this data.

In this correspondence the agency indicated that its concerns about the regulations were great enough in 1982 to cause it to draft new ones. The reason given later in 1982 for not publishing these proposed regulations—to give industry self-regulation a chance to work—was by 1984 too stale to justify continued inaction. Moreover, in 1984 the Deputy Administrator admitted the "apparent inconsistency of the current regulations regarding the weight

of action devices with the law and the [Auburn] research." J.A. at 90. In the face of this "apparent inconsistency," the Deputy Administrator passively noted his disappointment that industry representatives "felt that the allowable weight of action devices could not be lowered and still retain the desired gait." *Id.*

This statement suggests a belief that the Act was a sort of compromise between industry proponents of soring and persons who regarded the practice as barbarous. The agency's litigation posture in this court partially corroborates that it holds such a notion. Its brief cites an ambiguous portion of the legislative history to support the proposition that one of Congress's concerns in the Act was to allow "horse trainers and owners to compete at horse shows without unnecessary restriction...." [2] At oral argument, counsel for the Secretary did nothing to allay fears that the agency "has been blind to the source of its delegated power," *State Farm,* 680 F.2d at 221, when she appeared to resist the proposition that the Act was intended to prohibit devices reasonably likely to cause soreness. *See* 9 C.F.R. § 11.2(a) (1986).

We see nothing ambiguous in the Act's treatment of soring methods. The Act was clearly designed to end soring. S.Rep. No. 609, 91st Cong., 1st Sess. 1 (1969); H.R. Rep. No. 1597, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Admin. News 4870, 4871. It explicitly finds that soring is "cruel and inhumane," 15 U.S.C. § 1822(1), flatly prohibits the showing in a horse show of "any horse which is sore," *id.* § 1824(2), and makes it a criminal offense knowingly to do so, *id.* § 1825(a)(1). Moreover, Congress amended the Act in

---

2. The Brief for Appellee at 8–9 quotes from S.Rep. 418, 94th Cong., 1st Sess. 3 (1975) as follows:

The committee has determined that the amendments described herein are necessary to render the 1970 Act enforceable and effective. It is expected that it will be utilized, and utilized successfully, for the purpose of eliminating the practice of soring. *However, the amendments do not grant carte blanche authority to the Department of Agriculture. Its efforts to eliminate the intentional injuring of*

*horses should not be expanded to affect their competitive position within the walking horse class.*

(Emphasis in Brief.) The point of the final two sentences is unclear. It may be no more than a gentle reminder to the Secretary that the Act does not empower him to prosecute abuses in the horse industry that have nothing to do with soring. In any case, as discussed, *infra,* the Act and its history as a whole make it clear that the emphasis should be on the sentence preceding the language stressed by appellee.

1976 "to stop an inhumane and harmful practice that the Congress thought would end when it enacted [the original Act], but which has not in fact ended." S.Rep. 418, 94th Cong., 1st Sess. 1 (1975); *accord* H.R. Rep. No. 1174, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S.Code Cong. & Admin.News 1696, 1699. *See generally Thornton v. Department of Agriculture,* 715 F.2d 1508, 1511–12 (11th Cir.1983) (giving reasons for 1976 amendments).

There is no indication in the Act or the legislative history that Congress was concerned with the ability of horse owners to "retain the desired gait," at least insofar as the desired gait required soring. To be sure, the legislative history shows concern for owners who refused to adopt the practice of soring, but instead used "patient, careful training ... and natural breeding" to achieve the distinctive walk. S.Rep. No. 609, at 1–2. Soring, which causes horses to perform beyond their natural ability, put these owners at a competitive disadvantage. *See id.;* H.R.Rep. No. 1597, at 2, *reprinted in* 1970 U.S.Code Cong. & Admin. News at 4871. The Act sought to do away not only with the unnecessary cruelty of soring, but also with this unfair competition. *See Thornton,* 715 F.2d at 1511. But it shows no solicitude for owners who favor soring.

We stress this simple point because the Secretary appears to have misapprehended it. It is true that the agency's regulations contain a general prohibition against devices likely to cause soreness, and under a reasonable interpretation of the present regulations no action device that caused soreness would be considered legal. *See* 9 C.F.R. § 11.2(a) (1986). Some administrative decisions, however, view the specific prohibitions of 9 C.F.R. § 11.2(b) as allowing soring with devices not listed. *See* J.A. at 74–75 (letter of Agriculture Department's Office of General Counsel discussing Agriculture Decisions). The existence of language to the contrary in one administrative decision, *In re Rowland & Meadows,* 40 Agric. Dec. 1934 (1981), *aff'd on other grounds sub nom. Fleming v. Department of Agriculture,* 713 F.2d 179 (6th Cir.1983), does not demonstrate that the Secretary has adopted a reasonable interpretation of the Act.

In sum, we conclude that the Secretary has not presented a reasonable explanation of his failure to grant the rulemaking petition of the Association, particularly in light of the apparent message of the Auburn study. Moreover, what he has said strongly suggests that he has been blind to the nature of his mandate from Congress.

## IV. THE REMEDY

The Association seeks an order directing the Secretary to institute rulemaking proceedings. Our cases make clear, however, that such a remedy is appropriate "only in the rarest and most compelling of circumstances." *WWHT,* 656 F.2d at 818. In arguing that the present circumstances qualify, the Association relies on *Geller v. FCC,* 610 F.2d 973 (D.C.Cir.1979). In fact, however, the court in *Geller* merely remanded to the agency to inquire into whether the changed circumstances called for amendment of the earlier rule, *id.* at 980 n. 59, leaving it to the agency to choose the form of the inquiry. *Cf. WWHT,* 656 F.2d at 819 (indicating that ordinarily it is appropriate simply to require the agency "to reconsider its denial of the petition, in light of the correct interpretation of the law as enunciated by the court") (emphasis omitted). This remedy is particularly appropriate when the agency has failed to provide an adequate explanation of its denial. *Cf. Celcom Communications Corp. v. FCC,* 789 F.2d 67, 71 (D.C.Cir.1986) (case remanded because agency explanation "not articulated with sufficient clarity or specificity to permit us to engage in meaningful review.").

The findings of the Auburn study may or may not remove a "significant factual predicate" of the original rules' gaps. The issues as to the Auburn study's validity and significance lie within the institutional competence of the Secretary. *See Motor Vehicle Manufacturers,* 463 U.S. at 53, 103 S.Ct. at 2872. He therefore must be given a reasonable opportunity to explain his decision or to institute a new rulemaking

proceeding on action devices and other soring practices.

We vacate the judgment of the District Court and remand to that Court with instructions to remand the case to the Secretary for further consideration consistent with this opinion.

*So ordered.*