**AMERICAN HORSE PROTECTION ASSOCIATION, INC., Plaintiff,**

v.

**Richard E. LYNG, Secretary, U.S. Department of Agriculture, Defendant.**

**Civ. A. No. 84–3298–OG.**

United States District Court, District of Columbia.

March 21, 1988.

---

Russell J. Gaspar, Washington, D.C., for plaintiff.

Patricia D. Carter, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

## I. INTRODUCTION

This matter is before the Court on defendant's motion to dismiss and plaintiff's motion for summary judgment following a remand from the United States Court of Appeals for the District of Columbia Circuit. *American Horse Protection Association v. Lyng*, 812 F.2d 1 (D.C.Cir.1987) (hereinafter *AHPA v. Lyng*). The Court of Appeals directed this Court to remand the matter to the Department of Agriculture for the Secretary to provide a more detailed explanation of the decision not to institute amendatory rulemaking concerning the "soring" of horses. The agency has again denied plaintiff's application for rulemaking, and has moved to dismiss this action on grounds that the Secretary has now adequately explained his decision to deny plaintiff's rulemaking petition. Along with its motion the agency has submitted to the Court an explanation for its refusal to institute the rulemaking requested by plaintiff. The declaration of Dr. John K. Atwell, Deputy Administrator for Veterinarian Services, Animal and Plant Health Inspection Services ("APHIS") of the United States Department of Agriculture ("USDA") serves as the Secretary's explanation.

Plaintiff has responded with its own motion for summary judgment, supported by a memorandum that also opposes the motion to dismiss. Plaintiff contends that the Secretary's explanation is insufficient and lacks a rational basis. Plaintiff asserts that the existing regulations conflict with the Horse Protection Act in that they permit the use of devices and techniques that cause a horse to become sore or can reasonably be expected to cause soreness.

For the reasons set forth more fully in this memorandum, the Court denies defendant's motion to dismiss and grants plaintiff's motion for summary judgment. The Court directs the Secretary of the Department of Agriculture to institute rulemaking procedures concerning the use of action devices on show horses. The Court holds that the existing regulations are contrary to law and that the Secretary has ignored his mandate from Congress under the Horse Protection Act.

## II. BACKGROUND AND FACTS

Congress passed the Horse Protection Act in 1970, finding that the practice of deliberately injuring show horses to improve their performance is "cruel and inhumane." 15 U.S.C. § 1822(1). Known as soring, the techniques practiced include fastening action devices, such as chains or padded shoes to the horses limbs or forefeet, and applying irritating solutions to their forefeet.[1] The pain inflicted on sored horses causes them to quickly lift their forefeet and thrust them forward, in a high-stepping gait that is highly prized among breeders of Tennessee walking horses.

The Horse Protection Act prohibits, among other things, the showing in a horse show of "any horse that is sore," or the sale of any such horse. 15 U.S.C. § 1824(2). Not only did Congress provide civil penalties for violations of the Horse Protection Act, it made it a criminal offense to knowingly violate the act. *Id.* § 1825. In 1976, Congress amended the Act "to stop an inhumane and harmful practice that the Congress thought would end when it enacted the Horse Protection Act of 1970 (Pub.Law 91–540), but which has not in fact ended." S.Rep. 418, 94th Cong., 1st Sess. 1 (1975). Not only did Congress seek to put an end to the unnecessary cruelty of soring, it also sought to eliminate the competitive disadvantage faced by horse owners who do not practice soring techniques. *AHPA v. Lyng*, 812 F.2d at 7.

The D.C. Circuit, in reviewing this case, held that the Horse Protection Act was "clearly designed to end soring." *AHPA v. Lyng*, 812 F.2d at 6. Congress delegated to the Secretary of Agriculture the power to regulate under the Act. 15 U.S.C. § 1828. The Secretary of Agriculture has delegated the authority to issue regulations under the Horse Protection Act to Dr. Atwell, the Deputy Administrator for Veterinary Services of APHIS, within the USDA. The agency's existing regulations contain a general prohibition against devices likely to cause soreness. 9 C.F.R. § 11.2(a). The Court of Appeals stated that "under a reasonable interpretation of the existing regulations no action device that caused soreness would be considered legal." *AHPA v. Lyng*, 812 F.2d at 7. The regulations also contain express prohibitions of specific soring devices and techniques. 9 C.F.R. § 11.2(b). Some of the administrative rulings within the Department of Agriculture indicate that where specific prohibitions are listed, those not listed *may* be allowed.

---

1. In defining *sore,* Congress provided:

The term "sore" when used to describe a horse means that—

(A) an irritating or blistering agent has been applied, internally or externally by a person to any limb of a horse,

(B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,

(C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or

(D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,

and, as a result of such application, infliction, injection, use, or physical practice, such horse suffers, *or can reasonably be expected to suffer,* physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving....

15 U.S.C. § 1821(3) (emphasis added).

*AHPA v. Lyng,* 812 F.2d at 7. Finding that language to the contrary contained in one administrative decision did not demonstrate that the Secretary had adopted a reasonable interpretation of the Act, the Court of Appeals concluded that the Secretary had failed to provide a reasonable explanation of his failure to grant the rulemaking petition, "particularly in light of the Auburn study." *Id.*

## III. DISCUSSION

The Administrative Procedure Act provides that interested persons may "petition [the appropriate agency] for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 555(e). When such petitions are denied, the agency involved must give "a brief statement of the grounds for denial." *Id.* The Court must determine whether the Secretary's refusal to institute rulemaking was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *AHPA v. Lyng,* 812 F.2d at 4. The standard of review in this case is whether the Secretary has provided

> an articulated justification that makes a "rational connection between the facts found and the choice made" and follows upon a "hard look" by the agency at the relevant issues.

*Action for Children's Television v. FCC,* 564 F.2d 458 (D.C.Cir.1977) (footnotes omitted); *see AHPA v. Lyng,* 812 F.2d at 5.

A refusal to institute rulemaking "is to be overturned 'only in the rarest and most compelling of circumstances,' *WWHT, Inc. v. FCC,* 656 F.2d 807, 818 (D.C.Cir.1981),

which have primarily involved 'plain errors of law, suggesting that the agency has been blind to the source of its delegated power.'" *AHPA v. Lyng,* 812 F.2d at 5 (*quoting State Farm Mutual Automobile Insurance Co. v. Department of Transportation,* 680 F.2d 206, 221 (D.C.Cir.1982), *vacated on other grounds,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). In this case, the D.C. Circuit has stated that "a refusal to initiate rulemaking naturally sets off a special alert when a petition has sought modification of a rule on the basis of a radical change in its factual premises." *AHPA v. Lyng,* 812 F.2d at 5. If this Court finds that a significant factual predicate of a prior decision not to promulgate a specific rule has been removed, the Court may force the agency to institute rulemaking proceedings. *Id.*

The regulation that plaintiff seeks to have amended expressly prohibits specific devices, but does not mention ten-ounce chains or padded shoes. Specifically, plaintiff seeks the Court to set aside the regulations published at 9 C.F.R. § 11.2(b)(1), (2), & (10) as unlawful,[2] and to direct the agency to institute rulemaking proceedings to prohibit "action devices" and padded shoes of unrestricted height. Essentially, plaintiff seeks to have additional devices listed in the specific prohibitions in the regulations. Plaintiff contends that a study commissioned by the agency and performed by Auburn University School of Veterinary Medicine reflects the need for amendatory rulemaking.

2. The regulations provide:
(b) *Specific Prohibitions.* The use of any of the following devices, equipment, or practices on any horse at any horse show, horse exhibition, or horse sale or auction is prohibited:
(1) All beads, bangles, rollers, and similar devices, with the exception of rollers made of lignum vitae (hardwood), aluminum, or stainless steel, with individual rollers being of uniform size, weight and configuration, provided each such device may not weigh more than 14 ounces, including the weight of the fastener.
(2) Chains weighing in excess of 8 ounces each including the weight of the fastener on 2–year–old horses and chains weighing in excess of 10 ounces each including the weight of the fastener on horses 3 years or older.

. . . . .

(10) Toe length that does not exceed the height of the heel by 1 inch or more. The length of the toe shall be measured from the coronet band, at the center of the front pastern along the front of the hoof wall, to the ground. The heel shall be measured from the coronet band, at the most lateral portion of the rear pastern, at a 90 degree angle to the ground, not including normal caulks at the rear of a horseshoe that do not exceed ¾ inch in length. That portion of caulk at the rear of a horseshoe in excess of ¾ of an inch shall be added to the height of the heel in determining the heel-toe ratio.
9 C.F.R. § 11.2(b).

The agency disagrees, discounting the findings of the study on several grounds, and finding it unnecessary to amend its existing regulations concerning the "soring" of horses. The explanation for the refusal to amend the regulations is contained in a declaration by Dr. Atwell. Not only does Dr. Atwell discount the findings of the Auburn study, he states that, if the devices cause soreness, the general prohibition of devices likely to cause soreness, published at 9 C.F.R. § 11.2(a), covers those devices plaintiff proposes to have listed. The question before the Court is whether a significant factual predicate relied upon by the Secretary in 1979 in promulgating the existing regulations has been removed by the findings of the Auburn study. If so, the Secretary may be required to reexamine and reissue the regulations in question.

### A.  *The Auburn Study*

Between September 1978 and December 1982, Auburn University School of Veterinary Medicine conducted a study, entitled "Thermography in Diagnosis of Inflammatory Processes in Horses in Response to Chemical and Physical Factors," pursuant to a cooperative agreement with the Agriculture Department. Among its purposes, stated in the agreement, was the development of "data related to horse soring methods and thermovision detection thereof." Plaintiff's Exhibit 1 at 1. At the time of the issuance of the existing regulations, the agency characterized the study as a study "of soring methods and techniques," which might eventually result in the need for amendatory regulations. 44 Fed.Reg. 25,172, 25,174 (April 27, 1979). Notwithstanding its prior statements, the agency today has characterized the study as essentially a study of the use of thermography as a diagnostic tool, rather than the study of soring methods and techniques. This type of recasting is unpersuasive.

The study was composed of 18 phases that examined a variety of devices and conditions relating to soring. Of direct relevance to this case are those concerning the effect of ten-ounce chains and padded shoes, Phases VI, XV and XVI. Plaintiff

argues that the results of these phases remove a factual predicate that was relied upon by the agency when it promulgated the existing regulations. The Court agrees. The study reveals that devices not specifically listed in the regulations can reasonably be expected to cause soreness to show horses. The agency, on the other hand, not only attempts to recharacterize the nature of the study, it discounts the validity of its findings.

### 1.  *Phase VI*

Phase VI of the study was an evaluation of the effect of ten-ounce chains, which are not specifically prohibited in 9 C.F.R. § 11.2(b)(2). Three normal horses were exercised without chains for several days to obtain normal thermographic patterns and pressure data. Plaintiff's Exhibit 2 at 6. Thereafter ten-ounce chains were fitted to the horses according to USDA, APHIS, Veterinary Services regulations, and the horses were exercised for ten consecutive workdays, with weekends off. One horse had chains on both pasterns, the second horse had one chain on his left pastern, and the third had one chain on his right pastern. Results showed lesions on the pasterns, with the presence of swelling, leaking and bleeding. *Id.* The researchers concluded that the use of ten-ounce chains for ten days, without any chemical applications, produces lesions that can be seen visually in eight to ten days and thermographically within two to three days. *Id.* These lesions constituted soreness, although the researchers concluded that the "extent of soreness due to chains only are less dramatic that the chemical soring." *Id.*

The agency contends that the use of only three horses and the failure to use "controls," as well as the fact that only one of the horses had a chain on both of its pasterns, diminishes the reliability of the findings in Phase VI. Dr. Atwell also suggests that the length of the text devoted to the findings of Phase VI—five paragraphs out of a twenty-one page summary of the study—somehow demonstrates its unreliability. Dr. Atwell states: "The portion of the study dealing with the use of eight and

ten-ounce chains was extremely small and of limited value as it involved only three horses, only one of which had chains on both pasterns." Declaration to the Court at 18. Furthermore, he states that the results of Phase VI do not contradict the findings of the agency's veterinarians or the data compiled from horse shows.

There is no doubt that the conditions reported by the researchers fall within the legal definition of "sore," according to 15 U.S.C. § 1821(3). The agency's objections to the study are without merit. The size of the study sample—three horses—does not affect the study's validity or the significance of its results. The principal investigator for the study, Dr. Purohit, attests that "similar results would have been obtained" if more animals had been in the study. Purohit Affidavit ¶ 5. Additionally, the results of Phase VI confirm the results of an earlier, 1975 study conducted by the USDA. Id. ¶¶ 4–5. Even Dr. Atwell testified at his deposition that he had no evidence that the results would have been different if there had been more horses in the study sample, Deposition of Dr. Atwell at 96–97, and acknowledged the validity of Phase X in which the study sample contained only three horses, id. at 41–43; Declaration to the Court at 5.

As to the use of scientific controls in conducting the study, neither Dr. Atwell's deposition nor his declaration clarifies what controls were lacking. Dr. Purohit attested that the studies were subject to proper controls, namely the use of a chain on only one leg of a test animal. Purohit Affidavit ¶ 6. Dr. Atwell indicates that proper controls would have existed if horses without action devices had been tested concurrently with the test animals. However, the data collected both before and after exercise suggests that Dr. Atwell is off-base on the subject of controls. Ample data exists concerning the thermographic patterns of a normal horse for purpose of comparison with the Phase VI horses. Id.

With respect to the suggestion that the use of action devices on one leg is improper because it is contrary to the way that horses are normally trained or used in the ring,

plaintiff contends that this measure provided an important control measure. Dr. Atwell's deposition testimony reflects that he conceded that the action devices produced the same effects—inflammation and tissue damage—whether used on one leg or two. Deposition of Dr. Atwell at 108–12. Furthermore, Dr. Atwell could not recall whether the agency had ever advised the researchers that Phase VI was inadequate or improperly done. Dr. Atwell even acknowledged that the results of Phase VI had been the basis for a proposed rulemaking in 1982 to ban all action devices. Id. at 111–12.

Plaintiff asserts that the real reason the agency decided not to amend the regulations in the face of the Phase VI results is that it assumes that a ten ounce chain would not under normal circumstances hurt a horse. Dr. Atwell acknowledged that Phase VI added to the agency's body of knowledge the finding that a ten ounce chain was capable of producing lesions. Deposition of Dr. Atwell at 115–15, 117. But he testified that when handled properly, under normal conditions, a ten-ounce chain would not cause soring. Id. Thus, even though the study found that lesions were created, and even though Dr. Atwell acknowledged that inflammation and swelling falls within the legal definition of "sore," the agency contends that the findings did not constitute soring. Plaintiff asserts and the Court agrees that the statutory definition of soring was met by the findings of Phase VI, citing the size (1 to 2 centimeters) and the deepness (0.5 centimeters) of the lesions produced, as well as the presence of swelling, seeping, and bleeding. As plaintiff notes, these findings even fall within Dr. Atwell's definition of "sore." Id. at 99, 100, 105.

The agency has stated that, assuming arguendo, lesions are discernable after eight to ten days of using ten-ounce chains, "it does not prove that ten-ounce chains will necessarily sore a horse under any and all circumstances." But the statutory standard is whether a horse equipped with an action device "can reasonably be expected to suffer" pain, distress, inflammation or lameness. 15 U.S.C. § 1821(3). For that

reason, the fact that ten-ounce chains may not in every instance cause soreness is irrelevant to this Court's inquiry. Because results of Phase VI of the Auburn study indicate that a horse equipped with ten-ounce chains can reasonably be expected to suffer pain, distress, inflammation or lameness, the Court sets aside the regulations published at 9 C.F.R. § 11.2(b)(1) & (2), which allow these devices to be used, as contrary to the Horse Protection Act. For the same reasons, the Court holds that the agency's denial of plaintiff's petition for rulemaking was arbitrary and capricious. Finding the agency has been blind to the purpose of the Horse Protection Act, the Court directs it to institute rulemaking proceedings forthwith.

### 2. *Phases XV and XVI*

■ In Phases XV and XVI, the researchers studied the effect of padded shoes or "pressure shoeing" to determine whether a horse could become sore by manipulating the angle of the foot with pads. The results of Phase XV, although labeled "preliminary," reflect that manipulation of the angle of a horses foot causes abnormal inflammation, swelling and an unsound gait. Plaintiff's Exhibit 2 at 17–18. These abnormalities could only be discovered through thermography; that is, even a trained eye would be unable to detect the effects of padded shoes through clinical observation. Plaintiff's Exhibit 7. Phase XVI resulted in findings that various pressure shoeing techniques can be used to sore a horse in such a way that is not detectable by physical observation.

In his declaration to the Court, Dr. Atwell asserts that Phase XV involved the raising and lowering of the heels of two horses to "determine the applicability of thermography in these conditions." Declaration to the Court at 16. He characterizes the findings this way: "Although there were minor inflammatory changes, no definitive information came from this study. Thus there was not any data that could be used to substantiate the need for rulemaking." *Id.* at 16–17. With respect to Phase XVI, Dr. Atwell asserts that the study was limited to two horses and did not use con-

trol measures. On that basis, he asserts that the study of the effect of pressure shoeing is incomplete, and "does not appear to contradict the opinions provided by APHIS veterinarians in horse protection work that these techniques do not sore horses at a show." *Id.* at 17.

Plaintiff contends that Dr. Atwell could not offer any real reasons for his assertion that the results of Phase XV and XVI were inadequate. Indeed, Dr. Atwell's deposition testimony reflects that he generally agreed with the conclusions drawn by the researchers and had no information to contradict them. In his declaration to the Court, Dr. Atwell acknowledged "minor" changes in the horse's pasterns, but at his deposition could not define what minor as opposed to major changes were. Deposition of Dr. Atwell at 117–21. Plaintiff asserts that Dr. Atwell's use of the word *minor* is contrary to *abnormal*, the word choice of the researchers in describing the changes they found as a result of foot manipulation. In his deposition, Dr. Atwell acknowledged that there are ways to make a horse sore by improper shoeing. Deposition of Dr. Atwell at 124. He asserted that the USDA did not believe these techniques were being employed to sore horses. *Id.* at 125. He also asserted that any soreness caused by improper shoeing could be detected by a physical examination of the horse's pastern. This assertion is in direct contradiction of the researchers' findings, which state: "Soreness from pressure shoeing was not detectable in the pastern areas by physical examination or by thermographic technique in all cases, because pads obscure the solar surface of the foot." Plaintiff's Exhibit 2 at 18. Plaintiff also submitted affidavits of experts in the field of Tennessee Walking Horses who attest that pressure shoeing and other shoeing techniques do sore horses in such a way that cannot be detected by physical examination. Affidavits of Benefield ¶¶ 13–16; Scholl ¶ 8; Myers ¶¶ 4–5.

■ Because the findings of Phase XV were labeled "preliminary" by the researchers at Auburn University, the Court is unwilling to hold that a factual predicate

relied upon by the agency in promulgating the specific regulation concerning hoof manipulation, 9 C.F.R. § 11.2(b)(10), has been removed by Phase XV alone. In conjunction with the findings of Phase XVI, however, strong indications arise that padded shoes not only can reasonably be expected to cause soreness to a horse, but also can evade detection through the examination techniques employed at horse shows. The agency's chief complaints with Phase XVI are reminiscent of its complaints with Phase VI and equally unpersuasive. Indeed, Dr. Atwell conceded that it is possible to sore a horse with improper shoeing. Deposition of Dr. Atwell at 124. The agency's belief that those techniques are not being used, however, does not satisfy the statutory standard. If improper shoeing can reasonably be expected to cause soring, the technique is contrary to the Horse Protection Act. Because results of Phases XV and XVI of the Auburn study indicate that horses with padded shoes can reasonably be expected to suffer inflammation, the Court sets aside the regulation concerning hoof manipulation, 9 C.F.R. § 11.2(b)(10). For the same reasons, the Court holds that the agency's denial of plaintiff's petition for rulemaking was arbitrary and capricious. The agency has been blind to the purpose of the Horse Protection Act. Accordingly, the Court directs it to institute rulemaking proceedings forthwith.

### B. *Horse Show Data*

In determining that amendatory rulemaking was unnecessary, the agency reviewed the expert opinion of its own veterinarians who attend shows and examine horses at the shows they attend, and the records from horse shows that reflect the number of horses discovered to be sore at shows. The agency's veterinarians believe that, during shows and exhibitions, horses are not sored by the devices that currently are not specifically banned. According to the agency, virtually all Tennessee Walking horses are shown in action devices, and are inspected before entering the ring.

The agency asserts that its review of horse inspection data collected from over 85,000 horses in 1984–86 supports its conclusion that horses are not sored by devices that are not specifically prohibited in its regulations. The agency asserts that inspectors employed by horse shows have excused approximately three percent of the horses reviewed prior to exhibition. That figure includes horses excused for reasons other than soring. Only 0.21 percent of the horses inspected after shows were found to be sore by agency veterinarians in those years.

Dr. Atwell states:

These figures showing such a tiny percentage of horses becoming sore while wearing chains up to ten ounces and pads up to four inches demonstrate that such devices are not causing soring at the show and corroborates the expert opinions of our veterinarians.

We have reviewed and reconsidered the material that supported the current regulations and that material continues to support our view that we have prohibited all devices and substances which are likely to sore a horse at a show in normal use.

Declaration to the Court at 10. On that basis, the agency contends that it acted rationally in denying the petition for amendatory rulemaking because the horse show data "offers a more acceptable analysis on the issue of chains and their normal use at horse shows and sales." Defendant's Memorandum at 5.

Plaintiff, on the other hand, has raised valid concerns about the accuracy and reliability of the horse show data. If the horse show data relied upon by the agency is invalid, the agency's conclusion will also be invalid. The method of detecting soreness employed by the agency is one concern raised by plaintiff. Palpation of the pastern area does not accurately indicate the existence of pain, according to plaintiff. In 1975, researchers for the USDA acknowledged and Dr. Atwell conceded that sore areas may become temporarily insensitive to pain after continual irritation. Plaintiff's Exhibit 4 at 2; Deposition of Dr. Atwell at 44. Additionally, the methods used in examining horses by qualified examiners vary. Plaintiff alleges that some

qualified examiners fail to palpate the horses in a manner that would produce a true response. As further evidence of this problem, plaintiff cites Dr. Atwell's acknowledgement that disqualification rates are lower at shows where only industry examiners (under pressure from their colleagues not to disqualify horses) conduct the examinations than at shows where the USDA's veterinarians conduct the examinations.

Another concern raised by plaintiff is the difficulty of measuring the behavioral signs of soreness that trigger inspections following performances. Research conducted for the USDA in 1975 reflects that the deviation from a normal gait may be hard to detect and that it is possible to "warm up" a sore horse to such an extent that its symptoms of lameness would not be evident when it was led from its stall. Plaintiff's Exhibit 4 at 2. In his deposition testimony, Dr. Atwell conceded that this phenomenon—the disappearance of symptoms after a warm up—exists. Deposition of Dr. Atwell at 56–59.

Plaintiff also suggests that trainers are able to condition horses not to react when their pasterns are palpated, through a technique called "stewardship." Dr. Atwell acknowledged that he has heard accusations that this technique has been used, but the agency has no data to indicate its frequency. *Id.* at 49–50. Trainers also allegedly use substances to deaden pain and conceal physical signs of soring. Dr. Atwell acknowledged having heard rumors of these practices, but again stated that there was no evidence of how widespread this practice is. *Id.* at 51–54.

A related problem with the agency's reliance on horse show data, according to plaintiff, is that the sample of horses actually inspected is very small. For that reason, plaintiff contends the statistics do not accurately reflect the percentage of horses in the sample that were sore. Plaintiff suggests that instead of drawing its figures by dividing the number of sore horses by the total number of horses presented for exhibition, the agency should divide by the number of horses actually examined.

The result would be a significantly higher percentage of violations.

To all of these concerns, the agency responds that plaintiff appears to advocate the prohibition of all devices on the basis that there is no objective way to determine whether a horse is sore, "casually dismiss[ing] the existing regulatory scheme without acknowledging its effectiveness." Defendant's Opposition at 3. The agency acknowledges that the inspection process is somewhat subjective because reactions of the horses will vary. But the agency maintains that the existing regulations are not the source of these problems because it contends that the system is working. Additionally, the agency cites to the procedures within the regulations for eliminating incompetent inspectors.

The Court notes that the concerns raised by the plaintiff with respect to the horse show data are valid and compelling. Particularly with the findings of the Auburn researchers as a backdrop, the Court questions the reliability of the horse show data. Because the findings of the Auburn study have removed factual predicates upon which the agency relied when it promulgated the existing regulations, the horse show statistics and opinions of agency veterinarians will not call out of question the agency's denial of plaintiff's rulemaking.

## IV. CONCLUSION

Although compelling an agency to institute rulemaking is a drastic measure to take, it is apparent that the agency in this case has failed to take a hard look at the findings of researchers that it commissioned. The Court of Appeals did indicate that the agency is entitled to deference with regard to its expertise in analyzing studies such as the one conducted by Auburn University. But the agency must take a hard look at the relevant issues raised by the study and articulate a justification that makes a rational connection between the facts found and the choice not to institute rulemaking. *Action for Children's Television v. FCC*, 564 F.2d 458 (D.C.Cir.1977).

The Auburn researchers clearly found that the use of ten-ounce weights caused soreness to the test horses. The agency cannot gainsay this finding by asserting that these devices may not in all instances result in soring. All the statute requires is that the devices be reasonably capable of causing soreness. The agency has made a lame attempt at discounting the validity of Phase VI of the Auburn study. But it concedes that the results probably would have been no different if its purported defects had been cured. In the same vein, the study indicates, and the agency does not deny, that manipulation of the hoof with padded shoes can cause inflammation. Inflammation is one indicia of soreness, according to the Horse Protection Act. 15 U.S.C. § 1821(3). Padded shoes are thus reasonably capable of causing soreness. Furthermore, the horse show data has been effectively called into question by the concerns raised by plaintiff. Additionally, the agency's own assertion that virtually all Tennessee Walking horses wear action devices, including ten ounce chains and padded shoes, yet only a few are found to be sore suggests that the inspectors are missing through human error some soreness that would be detected by thermography.

This is one of those rare and compelling circumstances in which the agency has been blind to the source of its power, *AHPA v. Lyng*, 812 F.2d at 5, namely, the Horse Protection Act. There has been a change in the facts relied upon by the agency in 1979 when it issued the existing regulations. Due to technological advances, the researchers were able to discern more exactly the effects of ten-ounce chains and padded shoes on horses.

It is apparent that the agency needs to institute rulemaking proceedings for the additional purpose of gaining data on subjects that it concededly lacks. The agency needs to delve into the rumors and allegations of stewardship (conditioning horses not to react to pain) and the use of substances to mask pain and conceal its physical signs. Perhaps the agency should receive comments, as well, on the possible use of thermography to detect soreness at horse shows.

In sum, the Court holds that in denying plaintiff's rulemaking petition, the agency has acted arbitrarily and capriciously and without regard to the Horse Protection Act, which requires it to ban all devices reasonably capable of causing soreness. The general prohibition against devices that can reasonably be expected to cause soreness, 9 C.F.R. § 11.2(a), is obviously inadequate. Even in the face of the results of the Auburn study, the agency has continued to permit the use of ten ounce chains and padded shoes. The agency has been blind to the source of its delegated power and has failed to take a hard look at the results of the study and their relevance to the Horse Protection Act. Accordingly, the Court sets aside the regulations published at 9 C.F.R. § 11.2(b)(1), (2) & (10) as contrary to the Horse Protection Act, and orders the agency to institute rulemaking proceedings forthwith to promulgate regulations conforming to the requirements of the Horse Protection Act in their stead.

## ORDER

Upon consideration of defendant's motion to dismiss and plaintiff's motion for summary judgment, the oppositions to each motion, the entire record herein, and for the reasons set forth in the accompanying memorandum, it is by the Court this 18th day of March, 1988,

ORDERED that defendant's motion to dismiss be, and hereby is, denied; and it is further

ORDERED that plaintiff's motion for summary judgment be, and hereby is, granted; and it is

ADJUDGED AND DECLARED that the regulations set forth at 9 C.F.R. §§ 11.-2(b)(1), (2) & (10) are in contravention of the Horse Protection Act and therefore invalid; and it is further

ORDERED that the Secretary of Agriculture be, and hereby is, directed, forthwith, to institute rulemaking proceedings to promulgate regulations conforming to the requirements of the Horse Protection

Act in the stead of 9 C.F.R. §§ 11.2(b)(1), (2) & (10).