883 F.2d 93
 1991 A.M.C. 302, 280 U.S.App.D.C. 21
 NATIONAL CUSTOMS BROKERS & FORWARDERS ASSOCIATION OF
AMERICA, INC., Petitioner,
v.
UNITED STATES of America and the Federal Maritime
Commission, Respondents,
'8900' Lines, U.S. Atlantic-North Europe Conference, et al.,
Atlantic & Gulf/West Coast of South America
Conference, et al., Pacific
Coast/Australia-New Zealand
Tariff Bureau, et
al., Intervenors.
 No. 87-1754.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 4, 1989.
Decided June 30, 1989.
 
 Gerald H. Ullman, New York City, with whom Olga Boikess, Washington, D.C., was on the brief, for petitioner.
 Gordon M. Shaw, Atty., Federal Maritime Com'n, with whom Robert D. Bourgoin, General Counsel, Federal Maritime Com'n, John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondent.
 Howard A. Levy, with whom Marc J. Fink, F. Conger Fawcett, David C. Nolan, Eliot J. Halperin, Washington, D.C., Nathan J. Bayer, and Kevin Keelan, New York City, were on the brief, for intervenors.
 William Karas, Washington, D.C., also entered an appearance for intervenor.
 Before WALD, Chief Judge, RUTH BADER GINSBURG and BUCKLEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge RUTH B. GINSBURG.
 RUTH BADER GINSBURG, Circuit Judge.
 
 
 1
 The National Customs Brokers & Forwarders Association of America, Inc. (NCBFAA) seeks review of a Federal Maritime Commission (FMC or Commission) order dismissing the NCBFAA's petition to initiate a rulemaking proceeding. Petitioner NCBFAA sought Commission repeal of certain regulations governing ocean freight forwarding; the challenged regulations, the NCBFAA contends, are not authorized by the Shipping Act of 1984, 46 U.S.C. App. sections 1701-1720 (Supp. III 1985) (1984 Act), or are otherwise unreasonable. The NCBFAA also proposed rules to check particular practices of ocean common carriers. We hold that the FMC reasonably interpreted the Shipping Act of 1984 to authorize the challenged regulations and adequately explained its denial of the NCBFAA's rulemaking petition. Given the extraordinary deference due an agency when it declines to undertake a rulemaking, parties should hesitate to bring challenges unless they have far stronger grounds than those offered by petitioner in this case.
 
 I. BACKGROUND
 
 2
 Ocean freight forwarders arrange for exportation and transportation of merchandise via ocean carriers. As defined in the Shipping Act of 1984, "ocean freight forwarder" means:
 
 
 3
 a person in the United States that
 
 
 4
 (A) dispatches shipments from the United States via common carriers and books or otherwise arranges space for those shipments on behalf of shippers; and
 
 
 5
 (B) processes the documentation or performs related activities incident to those shipments.
 
 
 6
 Id. section 1702(19). A forwarder secures cargo space with a shipping line (books the cargo), coordinates the movement of cargo to shipside, arranges for the payment of ocean freight charges, and prepares and processes the ocean bills of lading, export declarations, and other documentation. Forwarders often perform accessorial services for the exporter, such as arranging insurance, trucking, and warehousing.
 
 
 7
 A forwarder receives compensation for its services both from its customer (the exporter or consignee) and from the ocean carrier. Customers pay a fee for accessorial services charged as a "markup" over the forwarder's actual disbursements. Carriers pay forwarders "brokerage," compensation in the form of a percentage of the ocean freight, but
 
 
 8
 only when the ocean freight forwarder has certified in writing that it holds a valid license and has performed the following services:
 
 
 9
 (A) Engaged, booked, secured, reserved, or contracted directly with the carrier or its agent for space aboard a vessel or confirmed the availability of that space.
 
 
 10
 (B) Prepared and processed the ocean bill of lading, dock receipt, or other similar document with respect to the shipment.
 
 
 11
 Id. Section 1718(d).
 
 
 12
 Section 19 of the Shipping Act of 1984, id. section 1718, contains specific limitations not only on the compensation of forwarders by carriers, but also on entry into the business of ocean freight forwarding. The forwarder is the only entity regulated by the FMC that is required to obtain a license before it can operate lawfully. To obtain a forwarder's license, an applicant must demonstrate experience and character qualifications and furnish a bond to insure financial responsibility. Id. section 1718(a).
 
 
 13
 Comprehensive forwarder regulation had its inception in 1946 when the Supreme Court held in United States v. American Union Transport, Inc., 327 U.S. 437, 66 S.Ct. 644, 90 L.Ed. 772 (1946), that independent ocean freight forwarders were subject to the regulatory provisions of the Shipping Act of 1916, 46 U.S.C.App. sections 801-842 (1982) (1916 Act). Following extensive investigation in the late 1940s, regulations issued in 1950 governing forwarder billing practices and carrier payments to forwarders. In 1954, the Federal Maritime Board (FMB) launched a second industry-wide investigation, culminating in 1961 in the publication of additional regulations. Investigation of Practices, Operations, Actions & Agreements of Ocean Freight Forwarders, 6 F.M.B. 327 (1961) (Ocean Freight Forwarders). The 1961 regulations declared "disguised markups" and free or reduced-rate forwarder services to be "unreasonable practices" in violation of the 1916 Act. Id. at 359, 366-67.
 
 
 14
 That same year, 1961, Congress provided for the licensing of ocean freight forwarders and confined payment of forwarder compensation by carriers to licensed forwarders that had performed specified services on behalf of the carrier and had so certified. Pub.L. No. 87-254, 75 Stat. 522 (codified as amended at 46 U.S.C.App. section 801; 46 U.S.C. section 841b). Pursuant to statutory direction to prescribe 'reasonable rules and regulations' governing forwarders, 46 U.S.C. section 841b(c), the FMC promulgated comprehensive rules, including one that required a forwarder to itemize on its bill its actual expenditures on the shipper's behalf, as well as the charges or fees assessed for its own services. These rules were affirmed in New York Foreign Freight Forwarders & Brokers Association v. FMC, 337 F.2d 289 (2d Cir.1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).
 
 
 15
 The FMC subsequently promulgated or considered further rules on which this case centers. In 1963, the Commission permitted carriers by water to perform forwarding services with respect to cargo they transport under their own bills of lading. 28 Fed.Reg. 4300, 4301 (1963). The legality of this rule remained unchallenged until now. In 1980, the FMC considered regulatory revisions designed to: (1) prohibit carriers from compelling forwarders to guarantee payment of freight before shippers had advanced funds for this purpose; (2) require carriers to compensate forwarders within thirty days of payment of ocean freight; and (3) permit forwarders to deduct their compensation when making freight payments for shipments under a prepaid bill of lading. 45 Fed.Reg. 17,029, 17,031-32, 17,040-41 (1980) (proposed rules). In 1981, after evaluating all comments received, the Commission determined not to promulgate these rules. 46 Fed.Reg. 24,565, 24,567-68, 24,574 (1981) (final rule).
 
 
 16
 Upon enactment of the Shipping Act of 1984, the FMC revised its rules to implement that legislation. These revisions included a prescription allowing a forwarder to provide a lump-sum invoice, but requiring the forwarder, upon request of its principal, to break out the items in the invoice. 49 Fed.Reg. 36,296, 36,297, 36,302 (1984) (final rules). The Commission rejected an alternative that would have deleted invoicing regulation entirely. 49 Fed.Reg. 18,839, 18,841 (1984) (interim rules).
 
 
 17
 On April 3, 1986, the NCBFAA requested a rulemaking to delete the regulations, currently codified in 46 C.F.R. Part 510 (1988), that: (1) require prior FMC approval of one licensee's acquisition of another licensee, id. section 510.19(a)(5); (2) prohibit a forwarder's provision of forwarding services free of charge or at a reduced fee, id. section 510.22(i); (3) require the forwarder to provide a detailed breakout of the components of its charges at the request of its shipper-customer, id. section 510.22(g); and (4) permit carriers to perform forwarding services, without a forwarder's license, with respect to cargo carried under the carrier's own bill of lading, id. section 510.4(c). The NCBFAA also sought two new regulations similar in content to rules proposed in 1980 and rejected by the Commission in 1981. First, to protect forwarders from payment defaults by carriers, the NCBFAA proposed that (1) when a forwarder pays the carrier freight charge due on behalf of the shipper, the forwarder may deduct its brokerage, and (2) when the shipper pays the carrier directly, or the freight is collected at destination, the carrier must pay brokerage within sixty days of the date of vessel sailing. Petition for Rulemaking at 5. Second, the NCBFAA proposed a rule that would stop a carrier from requiring a forwarder to assume liability for freight charges owed by the forwarder's principal. Id. at 6-7.
 
 
 18
 The FMC refused to institute rulemaking proceedings, In re Petition for Rulemaking of the Nat'l Customs Brokers & Forwarders Ass'n of Am., 24 Shipping Reg. (P & F) 116 (F.M.C. Apr. 27, 1987) (Order Denying Petition), and thereafter rejected the NCBFAA's petition for reconsideration, 24 Shipping Reg. (P & F) 581 (F.M.C. Oct. 16, 1987) (Order Rejecting Petition for Reconsideration).[1] The NCBFAA seeks review of the Commission's orders denying its petitions and asks this court to instruct the FMC to renew consideration of the rulemaking request.
 
 II. DISCUSSION
 A. Standard of review
 
 19
 While Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), teaches that nonenforcement decisions are presumptively unreviewable, we recently clarified that refusals to institute rulemaking proceedings remain outside Chaney's core and are subject to a judicial check. American Horse Protection Ass'n v. Lyng, 812 F.2d 1 (D.C.Cir.1987) (AHPA). At the same time, we underscored the extremely limited, highly deferential scope of that review. Id. at 4-5. We will overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency. Id. at 5. Furthermore, under the instruction furnished in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), to the extent that the intent of Congress is not clear, we must accept an agency's reasonable interpretation of the substantive terms of a statute it is charged to administer.
 
 
 20
 Before turning to petitioner NCBFAA's specific complaints, we note some salient differences between this case and the one on which the NCBFAA relied so heavily, AHPA. At issue in AHPA was "the practice [called soring] of deliberately injuring show horses to improve their performance in the ring." 812 F.2d at 1. In the Horse Protection Act, 15 U.S.C. sections 1821-1824 (1982), "Congress sought to end this practice." 812 F.2d at 2. The regulations originally promulgated by the Secretary of Agriculture proved inadequate to the task, yet the agency stood still, apparently believing "that the Act was a sort of compromise between industry proponents of soring and persons who regarded the practice as barbarous." Id. at 6. Stressing that the Act was not ambiguous--it "was clearly designed to end soring," id.--we held that the Secretary must further consider the matter and then either institute a new rulemaking or account satisfactorily for his decision not to do so. Id. at 7.
 
 
 21
 AHPA involved cruelty to certain animals and a clear congressional design to end it. In contrast, this case involves no similarly crystalline congressional objective and the interests at stake are "primarily economic." See WWHT, Inc. v. FCC, 656 F.2d 807, 819 (D.C.Cir.1981). Such interests, "without more, do [ ] not present the unusual or compelling circumstances that are required in order to justify a judgment by this court overturning a decision of the Commission not to proceed with rulemaking." Id.
 
 B. Prior approval of acquisitions
 
 22
 Petitioner NCBFAA requested that the FMC delete 46 C.F.R. 510.19(a)(5), which requires prior Commission approval of the acquisition of one forwarder by another. The NCBFAA claims that, in 1984, Congress deliberately eliminated the FMC's authority to approve " 'acquisitions in the maritime area' " so as to bring such agreements under " 'normal antitrust oversight.' " Brief of Petitioner National Customs Brokers & Forwarders Association of America, Inc. at 20 [hereinafter Brief of Petitioner] (quoting S.Rep. No. 3, 98th Cong., 1st Sess. 24 (1983)). Section 4(c) of the 1984 Act, as codified at 46 U.S.C.App. section 1703(c), states: "This chapter does not apply to an acquisition by any person, directly or indirectly, of any voting security or assets of any other person."
 
 
 23
 The Commission recognizes that it does not have acquisition permission authority that displaces normal antitrust oversight by executive branch agencies. The regulation in question, according to the FMC, does not purport to exercise agreement approval authority in an antitrust law context, but is simply an accoutrement of the Commission's licensing authority. See Order Denying Petition at 5, 24 Shipping Reg. (P & F) at 119.[2] Acquisition of additional licensees appears in 46 C.F.R. section 510.19(a) as the fifth item in a list of seven "changes in an existing licensee's organization" requiring Commission approval; other listed items include: license transfer; change in individual proprietorship ownership; and addition of partners to a licensed partnership. The Commission maintains control over these changes in a licensee's organization, the FMC states, simply and solely to insure that only qualified entities operate as forwarders: "The prior approval procedure ... allows the Commission the opportunity to ensure that all regulatory requirements are met before a licensee begins operating under circumstances different from those under which it was licensed." Order Denying Petition at 5, 24 Shipping Reg. (P & F) at 119.
 
 
 24
 We cannot say that the Commission's licensing and ample rulemaking authority under sections 19 and 17 of the 1984 Act, 46 U.S.C.App. sections 1718, 1716, are of insufficient breadth to accommodate the regulation requiring FMC approval of acquisitions by licensed forwarders. The NCBFAA asserts that there is no risk of an unqualified entity when two forwarders, already licensed, merge, and that other FMC regulations adequately guard against commencement of forwarder operations without meeting regulatory requirements. Brief of Petitioner at 21. It is not our function, however, to judge whether the FMC's regulations are necessary; so long as they are proper exercises of the Commission's statutory authority, their maintenance may not be disturbed by this court.[3]
 
 C. Forwarders' billing practices
 
 25
 Petitioner NCBFAA asked the FMC to delete 46 C.F.R. section 510.22(g), which requires a forwarder to itemize its charges upon request, and 46 C.F.R. section 510.22(i), which forbids free or reduced-rate services. The legal authority for these rules, the NCBFAA maintains, was section 16, First, of the 1916 Act, 46 U.S.C.App. section 815, which prohibited "any ... person subject to this chapter" from discriminating among shippers. See Brief of Petitioner at 24. In 1984, Congress eliminated broad-scale prohibitions of the 1916 Act, including section 16, First. Now, under section 10(b)(6), (10)-(12) of the 1984 Act, 46 U.S.C.App. section 1709(b)(6), (10)-(12), the NCBFAA emphasizes, it is unlawful only for common carriers (no longer "any person") to engage in discriminatory practices.
 
 
 26
 The Commission, however, relies on section 10(d)(1) of the 1984 Act, id. section 1709(d)(1), which states: "No common carrier, ocean freight forwarder, or marine terminal operator may fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property." Section 10(d)(1) was derived from section 17 of the 1916 Act, 46 U.S.C.App. section 816. The NCBFAA counters that the FMC had long applied section 17 only to physical services performed at the terminal. Brief of Petitioner at 28-29.[4] Although some forwarder activities, petitioner thus maintains, are subject to the Commission's 'reasonable practice' jurisdiction, those activities do not include fee arrangements for forwarding services preliminary to an actual shipment. Reply Brief of Petitioner National Customs Brokers & Forwarders Association of America, Inc. at 15-16 [hereinafter Reply Brief].
 
 
 27
 In American Union Transport, 327 U.S. 437, 66 S.Ct. 644, 90 L.Ed. 772, the Supreme Court recognized broad Commission authority to regulate forwarders, stating: "By the nature of their business, independent forwarders are intimately connected with" the activities listed under section 17, that is, "the receiving, handling, storing or delivering of property." Id. at 449, 66 S.Ct. at 650. To confine "reasonable practice" jurisdiction to physical cargo handling services performed at the terminal, the FMC indicates, would be inconsistent with American Union Transport; such an interpretation, in large measure, would place freight forwarders outside the statute because forwarders (unlike carriers and terminal operators--the other entities covered by section 10(d)) traditionally do not operate at terminals. Brief of Respondents at 33. We are satisfied that the Commission has fairly and reasonably construed section 10(d)(1)'s scope and now turn to the specific regulations the NCBFAA challenges.
 
 1. Disclosure of forwarders' markups
 
 28
 The FMC, in 1984, rejected arguments challenging the markup disclosure rule, and again retained the rule in 1987, noting its intention that the marketplace govern forwarder/customer relations to the maximum extent possible: "By providing the means to determine the level and reasonableness of forwarders' charges, the marketplace can regulate the relationship between forwarders and their principals. Petitioner has not offered any new facts or arguments to warrant overruling this prior determination." Order Denying Petition at 8, 24 Shipping Reg. (P & F) at 120. The NCBFAA complains that the Commission did not acknowledge that section 16, First, the statutory basis for the rule, had been repealed. Brief of Petitioner at 25-26 & n. 61. The Commission, however, hardly announced a novel position in recognizing that section 10(d)(1) of the 1984 Act, or section 17 of the 1916 Act, provides a basis for the markup disclosure requirement. See Ocean Freight Forwarders, 6 F.M.B. at 359, 366-67 (finding both "disguised markups" and free or reduced-rate forwarder services to be "unreasonable practices" in violation of section 17).[5]
 
 
 29
 Petitioner complains next that the FMC did not cite evidence of arbitrary and unreasonable markups or explain why no similar disclosure requirement is imposed on other business with which an exporter deals; furthermore, the NCBFAA objects, the Commission did not address petitioner's claims that industry customers, through ordinary business negotiations, are well able to determine the reasonableness of forwarding fees and that strong competition among forwarders protects exporters against overcharging. Brief of Petitioner at 26-27. In sum, petitioner asserts that the FMC has not said enough to assure a reviewing court that the Commission's refusal to delete the disclosure rule was the product of reasoned decisionmaking. These arguments, however, show neither legal error nor removal of a significant factual predicate for the FMC's prior ruling. See WWHT, 656 F.2d at 818-19 (discussing Geller v. FCC, 610 F.2d 973, 979 (D.C.Cir.1979)). To retain its rule, the FMC need not produce evidence showing that abuses are currently prevalent or that an unregulated market would fail to control such abuses. The Commission initiated regulation in response to abusive practices in an unregulated market; one would not expect the abuses to persist once checked by FMC rule. The Commission thus appropriately cited and adhered to its "prior determination."
 
 2. Free or reduced-rate services
 
 30
 The Commission also adhered to the following proscription: "No licensee shall render ... any freight forwarding service free of charge or at a reduced fee in consideration of receiving compensation from a common carrier or for any other reason." 46 C.F.R. section 510.22(i). Here too, the NCBFAA points out that the agency initially adopted the prohibition pursuant to section 16, First, Brief of Petitioner at 27; furthermore, petitioner stresses, section 10(b)(2) of the 1984 Act, 46 U.S.C.App. section 1709(b)(2), prohibits rebates by common carriers but not by forwarders. Rejecting the NCBFAA's claim that the rule lacks statutory authority under the 1984 Act, the FMC again relied on section 10(d)(1), which "prohibits a freight forwarder from failing to establish, observe, and enforce just and reasonable regulations and practices related to or connected with receiving, handling, storing, or delivering property." Order Denying Petition at 9, 24 Shipping Reg. (P & F) at 120.[6]
 
 
 31
 The FMC defends its rule as aimed primarily at forwarder practices abetting carrier discrimination among shippers through indirect rebates. Brief of Respondents at 38. To assist carrier discrimination banned by section 10(b), the Commission maintains, would constitute an "unreasonable practice" barred by section 10(d)(1). Id. at 39.[7] But the FMC's forwarder-directed rule goes further: it bars not only fees reduced "in consideration of receiving compensation from a common carrier," but also those reduced "for any other reason."
 
 
 32
 More broadly, therefore, the FMC urges that a forwarder's discrimination in charges among its customers reflects a misallocation that constitutes an unreasonable practice in itself. Ocean Freight Forwarders, 6 F.M.B. at 366-67, relied on this alternative section 17 rationale, as well as the "indirect rebate" rationale, in declaring such discrimination unlawful. We uphold the FMC's constant rule on the ground that the Commission, in the reasonable exercise of its rulemaking authority, may interpret section 10(d)(1) to prohibit forwarder discrimination in the charges billed to customers. See Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 281-82, 88 S.Ct. 929, 940-41, 19 L.Ed.2d 1090 (1968) (holding that "a relatively large charge ... unequally imposed" by an association of shipping industry employers on its members, for a fund to mitigate the impact upon stevedoring employees of technological unemployment, would violate section 17 unless "the charge levied is reasonably related to the service rendered"); California v. United States, 320 U.S. 577, 583, 64 S.Ct. 352, 355, 88 L.Ed. 322 (1944) (holding that the United States Maritime Commission could determine that "unreasonably long free time" and below-cost charges for wharf storage violated both sections 16 and 17).[8]
 
 D. Unlicensed forwarding by carriers
 
 33
 "No person may act as an ocean freight forwarder unless that person holds a license" from the FMC. 46 U.S.C.App. section 1718(a). This licensing provision includes only one express exception: "A person whose primary business is the sale of merchandise may forward shipments of the merchandise for its own account without a license." Id. section 1718(c). The 1984 Act thus continued the licensing requirements of 46 U.S.C. section 841b. FMC regulations, however, permit a common carrier to perform forwarding services without a license on shipments carried under its own bill of lading and pursuant to its published tariff. The provision in question, 46 C.F.R. section 510.4(c), states:
 
 
 34
 Common carrier. A common carrier, or agent thereof, may perform ocean freight forwarding services without a license only with respect to cargo carried under such carrier's own bill of lading. Charges for such forwarding shall be assessed in conformance with the carrier's published tariffs on file with the Commission.
 
 
 35
 Petitioner seeks the repeal of section 510.4(c), pointing in particular to the dramatic growth in operations by "non-vessel operating common carriers" (NVOCCs), and the attendant NVOCC competition with licensees in providing forwarding services. NVOCCs, typically, are small firms that do not own or operate transportation equipment, but instead lease facilities and services from other firms, and have a small workforce of primarily managerial and clerical employees. NVOCCs consolidate and load small shipments from multiple shippers into a single large reusable metal container obtained from a steamship company, and ship the container by vessel under a single bill of lading in the NVOCC's name; NVOCCs charge rates within the margin between the steamship line's (the vessel operator's) rates applicable to loose, "break-bulk" shipments, and special lower rates applicable to consolidated container loads.[9]
 
 
 36
 The Shipping Act of 1984 recognized the NVOCC as a legal entity with the status of "a shipper in its relationship with an ocean common carrier" but the status of a carrier in its relationship with exporter customers. 46 U.S.C.App. section 1702(17). An NVOCC assumes common carrier responsibilities for transportation even though it "does not operate the vessels by which the ocean transportation is provided." Id. The NVOCC is compensated only by the shipper.
 
 
 37
 Petitioner asserts that incompetent and irresponsible NVOCCs have created severe problems. Brief of Petitioner at 31. An NVOCC operates as a carrier solely by virtue of filing a tariff with the FMC. There are no formal entry requirements. Yet section 510.4(c) allows NVOCCs to offer the full gamut of forwarding services, including preparing and processing export declarations, sight drafts, insurance documentation, and letter-of-credit documents, on cargoes carried under their own bills of lading. Id. at 14-15. In short, the NCBFAA charges that in allowing unlicensed operations by NVOCCs, the Commission has dishonored Congress' "flat prohibition" against forwarding without a license. Id. at 33.
 
 
 38
 "Historically," the FMC said in its response to the NCBFAA's charge, "carriers have performed their own documentation and made arrangements to facilitate the movement of cargo to vessels." Order Denying Petition at 3-4, 24 Shipping Reg. (P & F) at 118. The Commission further observed that its rule "provides the shipping public protection by requiring carriers to publish any charges for performance of these functions in their tariffs." Id. at 4, 24 Shipping Reg. (P & F) at 118. The FMC discerned no legislative command "that carriers obtain a license in order to continue to perform these functions." Id. On the contrary, Congress did not approve language in H.R. 5068, 86th Cong., 2d Sess. (1960), an early draft of the licensing provision enacted in 1961, that would have required every person, including carriers, to be licensed to engage in the business of dispatching shipments on behalf of other persons. Id.[10]
 
 
 39
 The 1984 Act defines "ocean freight forwarder" as "a person in the United States that ... dispatches shipments from the United States via common carrier and books or otherwise arranges space for those shipments on behalf of shippers." 46 U.S.C.App. section 1702(19). It defines "common carrier" as "a person holding itself out to the general public to provide transportation by water of ... cargo." Id. section 1702(6). The FMC maintains that a common carrier, by engaging in booking or space arrangement activity, does not thereby acquire dual status; it remains a common carrier, and does not become a freight forwarder as well. The Commission cites legislative history in support: "It is not intended that booking or space arrangement activity by an ocean common carrier or its steamship agent would make either an 'ocean freight forwarder' as well." S.Rep. No. 3, supra, at 20, cited in Brief of Respondents at 19. In other words, a carrier does not become a forwarder merely by furnishing services to its own customers that a forwarder may provide. Brief of Respondents at 25-26; see Puerto Rico Ports Auth. v. FMC, 642 F.2d 471, 483-85 (D.C.Cir.1980) (holding that a common carrier that provided terminal services for cargo that it carried did not thereby become a terminal operator).
 
 
 40
 On the other hand, as petitioner points out, nothing in the text of the statute indicates that an entity cannot be both a carrier and an ocean freight forwarder, for both terms are defined functionally. Congress defined 'forwarder' simply by reference to the work forwarders perform. Petitioner infers from the passage quoted from S.Rep. No. 3, supra, that a carrier WOULD be subject to licensing when it performs the usual forwarding activities in addition to booking or space activity. Reply Brief at 8. Petitioner's argument, however, does not proceed far enough. It establishes no more than that the phrase "act as an ocean freight forwarder" in the licensing provision, 46 U.S.C.App. section 1718(a), is ambiguous with respect to carriers offering forwarding service only in conjunction with shipments carried under their own bills of lading. Again, therefore, we have no warrant to reject the FMC's reasonable interpretation.[11]E. Proposed rules regarding carrier practices
 
 
 41
 "It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking." WWHT, 656 F.2d at 818. This is not such a rare case. It contrasts with Farmworker Justice Fund, Inc. v. Brock, 811 F.2d 613, 633, vacated as moot, 817 F.2d 890 (D.C.Cir.1987); American Horse Protection Association, Inc. v. Lyng, 681 F.Supp. 949, 958 (D.D.C.1988); and Public Citizen v. Heckler, 653 F.Supp. 1229, 1241 (D.D.C.1986), each involving grave health and safety problems for the intended beneficiaries of the statutory scheme, each presenting facts urgently warranting remedial rules. Here, there is no similar risk or need, the issue are economic in nature, they entail policy determinations on which agency rulemaking discretion is respected. See WWHT, 656 F.2d at 819. Petitioner's arguments reveal no legal error on the Commission's part or compelling change in a factual predicate for the FMC's previous refusal to adopt the rules requested.
 
 1. Prompt payment of brokerage
 
 42
 The FMC proposed rules in 1980 to require carriers to pay forwarders promptly, 45 Fed.Reg. 17,029, 17,032 (1980) (proposed rules), but ultimately rejected the proposal, 46 Fed.Reg. 24,565, 24,568 (1981) (final rule). In 1986, when the NCBFAA renewed the proposal, the Commission reiterated its opinion that "this is a matter that should be resolved commercially and not through governmental intervention." Order Denying Petition at 11, 24 Shipping Reg. (P & F) at 121.
 
 
 43
 Petitioner claims that the FMC did not give a reasoned response to its 1986 request because:
 
 
 44
 The record made it clear that the FMC's deferral to marketplace forces does not work. Forwarders are often small concerns with insufficient bargaining leverage to sway powerful carriers. Reliance on the courts is not practical given the small amount of many individual brokerage claims. The FMC is assigned responsibility under the Shipping Act to protect a forwarder from carrier conduct that subjects it to an undue or unreasonable prejudice or disadvantage. 46 U.S.C.App. 1709(b)(12).
 
 
 45
 Brief of Petitioner at 41. None of these contentions, however, reveals any fundamental change in the circumstances existing at the time of the FMC's 1981 decision. Although petitioner alleges "it was evident from the unprecedented wave of carrier bankruptcies that the situation was far worse," Reply Brief at 18, this allegation indicates at most a better case than the one earlier made. The current contentions largely underscore those previously advanced and are not so extraordinary as to justify our interference with the agency's judgment.
 
 2. Liability for freight charges
 
 46
 In 1980, the Commission proposed to forbid carriers from requiring forwarders to assume liability for freight bills, unless the freight charges have been advanced to the forwarder by the shipper, "to protect the forwarder as well as to place the obligation for payment of freight on the real party in interest, i.e., the shipper." 45 Fed.Reg. 17,031-32 (1980) (proposed rules). The FMC rejected this proposal in 46 Fed.Reg. 24,568 (1981) (final rule). In 1987, the FMC rejected the NCBFAA's similar proposal as "neither necessary nor appropriate"; again, the Commission restated that "this appears to be a commercial matter best left to be resolved in the marketplace by the carrier, the forwarder, and the shipper." Order Denying Petition at 12, 24 Shipping Reg. (P & F) at 121. "Petitioner has not adequately supported its claim that carriers have unreasonably refused to release prepaid bills of lading, nor has the Commission received any other specific complaints about this practice." Id. Petitioner asserts that the FMC turned away its request without taking a "hard look" at the problem, Brief of Petitioner at 43, but the depth of the inquiry, under the circumstances presented, was within the domain of Commission discretion. See supra p. 95.CONCLUSION
 
 
 47
 For the reasons stated, we affirm the FMC's orders. The NCBFAA's petition for review is therefore denied.
 
 
 48
 It is so ordered.
 
 
 
 [1]
 The petition for reconsideration was not considered on its merits. The Commission, instead, rejected it under 46 C.F.R. section 502.261 (1988) because the petition did not, as that rule requires: (1) specify a change in fact or law since the initial order; (2) identify a substantive error in material fact in the initial order; or (3) address a matter upon which the petitioner had not previously had the opportunity to comment. Because the NCBFAA does not independently challenge the reconsideration rejection, this opinion focuses on the Commission's grounds for denying the rulemaking petition
 
 
 [2]
 Agreements covered by 46 U.S.C.App. section 1703 are subject to review by the Commission, id. sections 1704-1705, and if made effective, become exempt from the antitrust laws. Id. section 1706(a) ("The antitrust laws do not apply to ... any agreement that has been filed under section 1704 of this Appendix and is effective under section 1704(d) or section 1705 of this Appendix...."). Section 1703(c) thus limits only the FMC's power to grant antitrust immunity, not its power to make certain that merged forwarding firms are properly licensed
 
 
 [3]
 Petitioner also asked the FMC to delete 46 C.F.R. section 510.19(a)(6), which requires prior approval of any change in a licensee's name. The FMC continued the requirement because otherwise there would be an "inherent time lag between when a licensee changes its name and when it submits its notification to the Commission, [so that] the Commission's list of licensees would not always be accurate." Order Denying Petition at 6, 24 Shipping Reg. (P & F) at 119. As acknowledged at oral argument, petitioner does not pursue the name change approval issue before this court
 
 
 [4]
 Petitioner cites Johnson Products Co. v. M/V La Molinera, 619 F.Supp. 764 (S.D.N.Y.1985); Bethlehem Steel Corp. v. FMC, 642 F.2d 1215 (D.C.Cir.1980); and Puerto Rico Ports Authority v. FMC, 642 F.2d 471 (D.C.Cir.1980). All three cases are inapposite
 Johnson merely held that the forwarding contract was not a "maritime contract" within the admiralty jurisdiction of the federal courts, and that the particular "fraud" and "negligence" alleged in the complaint did not "come within the ambit" of section 10(d)(1) of the 1984 Act, or section 17 of the 1916 Act. 619 F.Supp. at 766-67. Petitioner cites no cases declaring any forwarding services, by their very nature, beyond the FMC's section 17 jurisdiction.
 Bethlehem Steel involved a harbor entry charge levied by a port commission on all commercial vessels. The commission imposed the charge in order to recover its investment in the construction of the harbor. This court held, simply and solely, that such a navigational (harbor construction) toll was not an impost "relating to or connected with the receiving, handling, storing, or delivering of property," and therefore was not subject to section 17 of the 1916 Act, 46 U.S.C.App. section 816.
 Puerto Rico Ports held that the party in question, a public shipping authority, was not covered by section 17 because it was neither a common carrier in foreign commerce nor an "other person subject to this chapter," 46 U.S.C.App. section 816, i.e., any noncarrier "carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water," id. section 801. The shipping authority, which was not a forwarder, furnished no terminal facilities, and thus was not an 'other person' within the section 801 definition. Puerto Rico Ports, 642 F.2d at 484. The NCBFAA's blending or confusion of persons who furnish "terminal facilities" and persons in "the business of forwarding" is unavailing. These are discrete categories. Section 801 plainly included forwarders without limitation to their activity at a terminal.
 
 
 [5]
 When the mark-up rule was challenged on appeal, it was affirmed under section 16, First. The court did not consider whether the rule was "necessary to eliminate purported violations of Section 17." New York Foreign Freight Forwarders, 337 F.2d at 299. We regard it as at least proper for the FMC to justify the rule as an exercise of its "reasonable practice" jurisdiction
 
 
 [6]
 The NCBFAA complains that the FMC (1) did not respond to its argument that the prohibition inhibits competition between forwarders and (2) ignored petitioner's showing that major customers, including federal agencies, insist on obtaining free services or heavily reduced fees. Brief of Petitioner at 30. Again, however, petitioner fails to indicate facts the Commission assumed did not exist when it promulgated the rule
 
 
 [7]
 Petitioner asserts that this section 10(d)(1) argument rests on the very section 16 "indirect rebate" theory that was rejected in Norman G. Jensen, Inc. v. FMC, 497 F.2d 1053, 1059 (8th Cir.1974) (rejecting the "rebate" argument made in that case as implying "a violation of section 16 any time a shipper employs an ocean forwarder because it is more economical than maintaining its own forwarding staff"). Brief of Petitioner at 28. Jensen, however, does not sweep as broadly as the NCBFAA suggests; it merely rejected the "rebate" argument, in the particular circumstances presented, as based on too tenuous a connection: the forwarder "subsidized" an agent that acted on behalf of shippers because of the forwarder's corporate relationship with the agent. 497 F.2d at 1055, 1058-59
 
 
 [8]
 Petitioner argues that these two cases, cited by the FMC in Brief of Respondents at 39-40, involve practices at the pier, stevedoring and wharf storage, which may be distinguished from a forwarder's fee arrangements with shippers. Reply Brief at 16. For the reasons stated supra p. 98, however, this distinction does not bring the billing practices here in question outside section 10(d)(1)
 
 
 [9]
 Since the 1960s, operations by NVOCCs have multiplied as a result of the containerization of ocean cargo and the growth of intermodal transportation, i.e., the movement of containers over several transportation modes, such as truck and rail. See New York Shipping Ass'n v. FMC, 854 F.2d 1338, 1344-45 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989); Council of N. Atl. Shipping Ass'ns v. FMC, 672 F.2d 171, 173-74 (D.C.Cir.), cert. denied, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982)
 
 
 [10]
 Although there is no explicit indication why Congress failed to adopt H.R. 5068, the FMC stresses that the legislature left unadopted the definitive resolution petitioner espouses
 
 
 [11]
 The FMC promulgated a rule relating to carrier operations, virtually identical to the one challenged here, in 28 Fed.Reg. 4300, 4301 (1963). The Commission argues that its "long and consistent practice ... may be presumed to have been adopted by Congress in passing the 1984 Act." Brief of Respondents at 25; accord id. at 18 (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-82 & n. 66, 102 S.Ct. 1825, 1840-41, n. 66, 72 L.Ed.2d 182 (1982); Lorillard, a Div. of Loew's Theatres, Inc. v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 869-70, 55 L.Ed.2d 40 (1978)). On the other hand: "This court has ... consistently required express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated." AFL-CIO v. Brock, 835 F.2d 912, 915 (D.C.Cir.1987). Although we cannot infer a congressional design to adopt the FMC's interpretation, the longevity of the Commission's stance and congressional inaction suggests the absence of contrary legislative intent, and the propriety of deferring to the agency's considered judgment