Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 7, 2004      Decided November 12, 2004

No. 03-1238

MIDWEST INDEPENDENT TRANSMISSION SYSTEM OPERATOR, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEW YORK INDEPENDENT SYSTEM OPERATOR, INC., ET AL.,
INTERVENORS

Consolidated with
03-1254

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Stephen L. Teichler* argued the cause for petitioners and intervenors in support of petitioners. With him on the briefs

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Arnold H. Quint*, *Michael E. Small*, *Jeffrey G. DiSciullo*, and *Deborah C. Brentani*. *Stephen G. Kozey* entered an appearance.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

Before: ROGERS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Obligated by statute to recoup its costs from industries it regulates, the Federal Energy Regulatory Commission funds its electricity-related programs through annual charges to public utilities based on the volume of electricity they transmit. In this case, two transmission providers, having unsuccessfully petitioned FERC to base those charges on sales as well as transmissions—an approach the Commission once followed but has now abandoned—ask this court to order FERC to reconsider its position. They argue that changed circumstances warrant a new rule because in the wake of severe disruptions in California and other western electricity markets, FERC has shifted its focus from transmission to sales—an allegation FERC vehemently disputes. Because we order rulemaking "only in the rarest and most compelling of circumstances," *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981), and because we defer to an agency's view of its own regulatory priorities, we deny the petition for review.

## I.

The Omnibus Budget Reconciliation Act of 1986 (the "Budget Act") requires that "the Federal Energy Regulatory Commission shall, using the provisions of this section and authority provided by other laws, assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year." 42

U.S.C. § 7178(a)(1). "The fees or annual charges assessed shall be computed on the basis of methods that the Commission determines, by rule, to be fair and equitable." *Id.* § 7178(b).

FERC first implemented section 7178 with respect to electricity regulation through Order No. 472 in 1987. *See Annual Charges Under the Omnibus Budget Reconciliation Act of 1986*, Order No. 472, [Regs. Preambles 1986-1990] FERC Stats. & Regs. ¶ 30,746, 52 Fed. Reg. 21,263 & 24,153 (1987), *clarified*, Order No. 472-A, [Regs. Preambles 1986-1990] FERC Stats. & Regs. ¶ 30,750, 52 Fed. Reg. 23,650 (1987), *on reh'g*, Order No. 472-B, [Regs. Preambles 1986-1990] FERC Stats. & Regs. ¶ 30,767, 52 Fed. Reg. 36,013 (1987), *on reh'g*, Order No. 472-C, 42 F.E.R.C. ¶ 61,013 (1988). That order assessed charges based on the twin aspects of FERC's electricity jurisdiction: transmission and wholesale sales in interstate commerce. In early 2000, FERC proposed updating the assessment methodology in light of "sweeping changes" in the electricity industry. *See Revision of Annual Charges Assessed to Public Utilities*, [Proposed Regs. 1999-2003] FERC Stats. & Regs. ¶ 32,550, at 33,917 (proposed Jan. 28, 2000), 65 Fed. Reg. 5,289, 5,291 (Feb. 3, 2000) ("*Revision of Charges NOPR*"). Whereas vertically integrated public utilities once provided "bundled" generation and transmission service to customers in a local market, a series of FERC orders in the 1990s required "functional unbundling" of transmission and generation services, mandating non-discriminatory access to interstate transmission facilities and encouraging utilities to place transmission assets under the control of independent entities such as "independent system operators" ("ISOs") and "regional transmission organizations" ("RTOs"). *See generally Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363-65 (D.C. Cir. 2004); *Pub. Util. Dist. No. 1 of Snohomish County v. FERC*, 272 F.3d 607, 610-12 (D.C. Cir. 2001) (per curiam).

Because FERC's new initiatives meant increased focus on "assuring open and equal access to public utilities' transmission systems," as opposed to monitoring wholesale electricity rates, FERC proposed to "assess our electric regulatory

program costs solely on the MWh of electric energy transmitted in interstate commerce by public utilities, rather than, as in the past, on both jurisdictional power sales and transmission volumes." *Revision of Charges NOPR*, [Proposed Regs. 1999-2003] FERC Stats. & Regs. at 33,920, 65 Fed. Reg. at 5,292. FERC pointed out that sellers, though not charged directly, would bear a portion of the charges through higher transmission rates. *Id.* at 33,920-21, 65 Fed. Reg. at 5,292. In October 2000, following notice and comment, FERC adopted the new policy in Order No. 641. *See Revision of Annual Charges Assessed to Public Utilities*, Order No. 641, [Regs. Preambles 1996-2000] FERC Stats. & Regs. ¶ 31,109, 65 Fed. Reg. 65,757 (2000) (codified at 18 C.F.R. § 382.201), *on reh'g*, Order No. 641-A, 94 F.E.R.C. ¶ 61,290, 66 Fed. Reg. 15,793 (2001).

Meanwhile, the electricity industry had entered a crisis. Beginning in June 2000, wholesale prices in California and other western states, driven by a combination of high gas costs, unusual weather, and slack supply, climbed to what FERC later called "unprecedented" levels. *See* FERC, Annual Performance Report for Fiscal Year 2001, at 1, 5 (Mar. 2002), http://www.ferc.gov/about/strat-docs/FY01-PR.pdf ("FY2001 Report"). As a result, retail costs in some areas rose by 200 to 300 percent, while two major California utilities, barred by state law from raising retail prices yet forced to buy power at short-term market rates, incurred crippling debts. *See In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1114-16 (9th Cir. 2001) ("*CalPX*"); FY2001 Report at 5. In response, FERC intervened and canceled a mandatory spot market, thus freeing utilities to enter long-term forward supply contracts. *See CalPX*, 245 F.3d at 1116-18; FY2001 Report at 5-6. At the same time, FERC launched an investigation of market problems and eventually ordered refunds for excessive wholesale prices. *See CalPX*, 245 F.3d at 1118-19; FY2001 Report at 5-6.

Caught off guard by the California debacle, FERC was contrite, stating in its FY2001 Annual Performance Report, "we have a duty to change the way we do business in light of the Western energy crisis." FY2001 Report at 7. Accord-

ingly, FERC adopted a new "Strategic Plan," a "first-ever Business Plan that will encourage much more conscious allocation of resources to the highest priority issues facing us," and "[n]ew performance measures, designed to build accountability into all our activities." *Id.* In its performance report for the following year, FERC proclaimed "a new sense of focus and direction" and "an increased emphasis on market oversight and investigation." FERC, Annual Performance Report for Fiscal Year 2002, at 5-6 (Feb. 2003), http://www.ferc.gov/about/strat-docs/FY02-PR.pdf ("FY2002 Report"). FERC established an Office of Market Oversight and Investigation ("OMOI") charged with "mak[ing] sure that energy markets work," *id.* at 9, and published notice of a major initiative to standardize wholesale electricity markets throughout the United States, *see Remedying Undue Discrimination Through Open Access Transmission Service and Standard Electricity Market Design*, [Proposed Regs. 1999-2003] FERC Stats. & Regs. ¶ 32,563 (proposed July 31, 2002), 67 Fed. Reg. 55,452 (Aug. 29, 2002) ("*SMD NOPR*"); FY2002 Report 7-9. While "put[ting] in place sufficient regulatory backstops to protect consumers against the exercise of market power when structures do not support a competitive market," this "standard market design" ("SMD") proposal aimed "to remedy remaining undue discrimination and establish a standardized transmission service and wholesale electric market design that will provide a level playing field for all entities that seek to participate in wholesale electric markets." *SMD NOPR*, [Proposed Regs. 1999-2003] FERC Stats. & Regs. at 34,281, 67 Fed. Reg. at 55,455.

FERC nonetheless stuck with Order No. 641 and assessed the first charges under the new system in July 2002. Though FERC had denied a rehearing request shortly after issuing Order No. 641, *see Revision of Annual Charges Assessed to Public Utilities*, Order No. 641-A, 94 F.E.R.C. ¶ 61,290, 66 Fed. Reg. 15,793 (2001), the New York Independent System Operator, Inc. ("NYISO") and other transmission providers filed fresh challenges based on their first bills. Among other things, they argued that the SMD proposal evidenced an attention to wholesale markets inconsistent with FERC's

assumptions in promulgating the new system. While insisting its focus remained on transmission, FERC denied the petitions as untimely collateral attacks on Order No. 641. *Cal. Indep. Sys. Operator, Inc.*, 101 F.E.R.C. ¶ 61,043 (2002). In response, NYISO, joined this time by the Midwest Independent Transmission System Operator ("MISO") and one other transmission provider, filed a rulemaking petition urging FERC to reconsider the order. The Midwest ISO Transmission Owners—the group of utilities owning transmission assets controlled by MISO—filed comments in support of the petition. FERC denied the petition, *see Midwest Indep. Transmission Sys. Operator, Inc.*, 103 F.E.R.C. ¶ 61,048 (2003), and when MISO and the MISO Owners (to whom we shall refer collectively as "MISO" throughout this opinion) sought a rehearing, FERC denied that as well, *see Midwest Indep. Transmission Sys. Operator, Inc., et al.*, 104 F.E.R.C. ¶ 61,060 (2003).

MISO now petitions for review of these two orders. NYISO has intervened in support.

## II.

Although both parties assure us that we have jurisdiction over this case, we have an independent obligation to be certain. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). We may consider petitions filed directly in this court—as was MISO's—only if Congress has provided for initial review in the courts of appeals. Otherwise, parties challenging agency action must first seek relief in the district court, proceeding to this court only on appeal—a procedure confusingly termed "nonstatutory review." *See Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439-40 (D.C. Cir. 1988). In this case, the jurisdictional basis advanced by the parties, 16 U.S.C. § 825*l*(b), is open to question because it applies only to orders issued in proceedings "under" the Federal Power Act ("FPA"), whereas the annual charges at issue here derive from 42 U.S.C. § 7178, a provision of the Budget Act. In the end, however, we agree with the parties that we have jurisdiction.

Though not part of the FPA, section 7178 directs FERC to implement its mandate "by rule," § 7178(b), and to assess and collect the fees "using the provisions of this section *and authority provided by other laws*," § 7178(a)(1) (emphasis added). With respect to FERC's electricity-related programs, the most relevant "authority provided by other laws" is FERC's FPA rulemaking power, which provides:

> The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter [i.e., the FPA].

16 U.S.C. § 825h. Because under section 7178 FERC's electricity programs depend on the annual charges for funding, regulations implementing those charges are "necessary or appropriate to carry[ing] out" FERC's broad mandate under the FPA to regulate electricity "in the public interest," 16 U.S.C. § 824(a).

To be sure, without section 7178, FERC would have no authority to issue the rule MISO and NYISO seek, for we held in *New England Power Co. v. Federal Power Commission*, 467 F.2d 425 (D.C. Cir. 1972), *aff'd*, 415 U.S. 345 (1974), that the FPA's rulemaking provision, having "an implementary rather than substantive character," did not permit FERC to recover its electricity budget absent specific statutory authorization. *Id.* at 430-31; *see also* H.R. Rep. No. 99-727, at 44 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3,607, 3,640 (House Budget Committee report on the Budget Act) (indicating that while "FERC does not currently have authority to assess charges on regulated companies" for much of FERC's work, "[t]he legislation gives that authority to FERC"). But as we said of the FCC in *Media Access Project v. FCC*, 883 F.2d 1063 (D.C. Cir. 1989), "compliance with statutory directives ... is certainly 'necessary in the execution of [the Commission's] functions.'" *Id.* at 1066 (quoting 47 U.S.C. § 154(i)) (alteration in original). Now that section 7178 obligates FERC to finance "all of the costs incurred by the Commission" with annual charges, 42 U.S.C. § 7178(a)(1), and

further obligates it to calculate the charges "by rule," *id.* § 7178(b), devising regulations to implement the annual charges is "necessary or appropriate to carry[ing] out" FERC's electricity regulation mandate under the FPA. Accordingly, FERC orders addressing section 7178 are "proceedings under" the FPA, even if the Commission's authority to issue them depends on the Budget Act.

The statutory context here—broad rulemaking power plus a substantive statute calling for implementation via other authorities—distinguishes this case from *Five Flags Pipe Line Co.* In that case, we held that a direct review provision limited to orders "issued under this Act" excluded challenges to user fees imposed by the Secretary of Transportation pursuant to a different statute. *See Five Flags*, 854 F.2d at 1440-41 (quoting Pub. L. No. 90-481, § 6, 82 Stat. 724 (1968)). The statute containing the review provision at issue, however, conferred much narrower rulemaking power than does the FPA: far from allowing all "necessary or appropriate" actions, as the FPA does, the Natural Gas Pipeline Safety Act (the "Gas Act"), Pub. L. 90-481, 82 Stat. 720 (1968) (codified as amended at 49 U.S.C. §§ 60101-60125), authorized the Secretary to order only "minimum Federal safety standards for the transportation of gas and pipeline facilities," § 3(b), 82 Stat. at 721. User fees are obviously not a "safety standard." At the same time, the user fee statute at issue in *Five Flags*, unlike section 7178, made no reference to any general rulemaking power or authority provided by other laws. *See Five Flags*, 854 F.2d at 1438-39 (discussing the Consolidated Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-272, § 7005, 100 Stat. 82, 140-41 (1986) (codified as amended at 49 U.S.C. § 60301)). Thus, in contrast to the rules requested here, which would engage FERC's authority under both the Budget Act and the FPA, the charges in *Five Flags* were attributable to the user fee statute only.

Our decisions in *General Electric Uranium Management Corp. v. United States Department of Energy*, 764 F.2d 896 (D.C. Cir. 1985), and *City of Rochester v. Bond*, 603 F.2d 927 (D.C. Cir. 1979), support our jurisdiction in this case. In the first case, we exercised jurisdiction under the direct review

clause of the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10139(a)(1)(A), even though that provision applied only to agency orders "under this part," whereas the waste disposal fees at issue—one-time charges paid into a "Nuclear Waste Fund"—originated elsewhere in the statute. *See GE Uranium*, 764 F.2d at 900-01. Calling it "inconceivable that Congress intended to have review of all actions concerning waste disposal in the court of appeals" save the disputed fees and "a few other matters," *id.* at 901-02, we considered it sufficient for jurisdictional purposes that a policy statement calling for the Nuclear Waste Fund appeared in the same part as the review provision. *See id.* at 901, 902. From this, it follows that the FPA's declaration that "Federal regulation . . . of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest," 16 U.S.C. § 824(a)—not to mention section 825h's broad grant of rulemaking authority—brings the electricity-related annual charges within the FPA's review provision. Indeed, we think it equally "inconceivable" that Congress intended to exclude the charges from the wide range of electricity-related actions subject to direct review under the FPA.

In *City of Rochester*, we held that a petition alleging that the Federal Aviation Administration had violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C), fell within the direct review provision of the FAA's organic statute. *See City of Rochester*, 603 F.2d at 932, 936-37. Spurning the theory that the review clause governed only "those [claims] going to the substantive core of an agency's mandate (to which presumably NEPA would in this case be penumbral)," and observing that we could not "imagine that Congress intended the exclusivity *vel non* of statutory review to depend on the substantive infirmity alleged," we declined to "fragment judicial review" based on the source of the violations asserted in the petition. *Id.* at 936-37. Likewise, here we interpret section 825*l* to afford unitary review of FPA-related orders, including those that implement substantive mandates from other statutes.

Moreover, "[a]bsent a firm indication that Congress intended to locate initial [Administrative Procedure Act] review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985) (emphasis removed). Here, as in most administrative cases and as FERC counsel emphasized at oral argument, "[t]he factfinding capacity of the district court is . . . unnecessary to judicial review of agency decisionmaking," because the administrative proceedings have already generated the record necessary for appellate review. *Id.* at 744. Hence, "jurisdiction in the court of appeals avoids duplicative review and the attendant delay and expense involved." *GE Uranium*, 764 F.2d at 903.

Given that FERC's fee regulations not only implement the Budget Act, but also help "carry out" the FPA, bringing them within the scope of section 825h, the placement of section 7178 in the Budget Act affords no "firm indication" that Congress intended to depart from this "sound policy" embodied in the FPA's direct review provision.

### III.

Turning to the merits, we review FERC's denial of MISO's petitions under familiar APA standards, reversing only if FERC's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As "the parameters of the 'arbitrary and capricious' standard will vary with the context of the case," our review is particularly deferential when "[t]he agency's determination is essentially a legislative one." *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981). Accordingly, "[w]e will overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency." *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 96-97 (D.C. Cir. 1989). We are particularly reluctant to compel rulemaking when the interests at stake are "primarily economic," as

they are here, *id.* at 97 (internal quotations omitted); our cases reversing rulemaking denials have typically "involv[ed] grave health and safety problems for the intended beneficiaries of the statutory scheme, . . . presenting facts urgently warranting remedial rules," *id.* at 103 (collecting cases).

Apart from their argument regarding changed circumstances, MISO's and NYISO's briefs assert various statutory and policy-based reasons for overturning FERC's system of charges: that cost causation principles bar the Commission from assessing charges only on transmission providers when FERC's regulatory activity is also directed at sellers; that assessing charges on bundled load transmitted by ISOs and RTOs, as Order No. 641 requires, exceeds FERC's jurisdiction because the load does not travel in interstate commerce; that assessing such charges deters local utilities from joining ISOs and RTOs; and that Order No. 641 contradicts the Commission's method of calculating gas pipeline user fees. At oral argument, however, counsel for MISO and NYISO withdrew these contentions.

Claiming that divestiture of transmission and generation assets has stalled, the ISOs argue that Order No. 641's methodology causes a greater disincentive to RTO/ISO formation than FERC expected. But although MISO and NYISO argued before the Commission that the order "works as a penalty to RTO participation"—one of the policy arguments they have now withdrawn—neither the rulemaking petition nor the petition for rehearing pointed to changed circumstances in the electricity industry as a factor bearing on the alleged disincentive. Because the ISOs have presented no "reasonable ground" for this default, we lack jurisdiction to consider their argument. *See* 16 U.S.C. § 825*l*(b); *Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105, 1114 (D.C. Cir. 2001).

This leaves only one argument for us to consider: that in response to the California crisis, FERC changed its regulatory focus and thereby undermined Order No. 641's factual basis. On this issue, we owe considerable deference to FERC's views, not only because of the "extremely limited,

highly deferential" standard of review, *Nat'l Customs*, 883 F.2d at 96, but also because FERC presumably knows its priorities better than either MISO or NYISO—or for that matter, this court. Although FERC's activities and statements may demonstrate its true intentions, contradicting positions taken in litigation, we know of no case, and MISO and NYISO cite none, where the circumstances compelling reconsideration of a rule involve the agency's own actions and plans. Given that under our standard of review we must defer to an agency's reasoned view of whether circumstances have changed sufficiently to justify a regulatory change, *see WWHT*, 656 F.2d at 817, our deference must be all the greater when the agency itself controls the circumstances in question, as it does here. In light of these principles, we can easily reject the ISOs' claims.

Arguing that FERC's "situation [is] analogous to *The Honeymooners* when Ralph Kramden's caught red-handed . . . [and] turns to Alice and demands whether she's going to believe him or her own eyes" (Tr. of Oral Argument at 12), MISO and NYISO cite three examples of FERC's purported focus on sales. First, they identify significant sales-related efforts in FERC's response to the California crisis, including investigations of allegedly excessive prices. Second, they point to FERC's efforts, evidenced by its annual reports and the creation of OMOI, to strengthen oversight of wholesale electricity markets. Finally, they cite the SMD proposal as evidence that FERC's future work will tilt toward structuring efficient markets rather than assuring transmission access.

In our view, none of this evidence reveals a dramatic change in FERC's priorities. To the extent the Commission's California intervention focused on sales, its actions reflected the imperatives of a singular event—a "perfect storm," FERC calls it (Resp't's Br. 47)—not a sustained shift in regulatory priorities. As to the more permanent changes, some—particularly the creation of OMOI—may indeed reflect renewed commitment to market oversight. Yet FERC never suggested in Order No. 641 that it would focus *exclusively* on transmission; instead, it stated that "the time and effort of our electric regulatory program is now *increasingly* devoted

to assuring open and equal access to public utilities' transmission systems," with "[w]holesale power sales rates . . . *increasingly* being disciplined by competitive market forces and less by the Commission directly." Order No. 641, [Regs. Preambles 1996–2000] FERC Stats. & Regs. at 31,848-49, 65 Fed. Reg. at 65,762 (emphasis added). Moreover, in asserting that its work "*is now* increasingly" focused on transmission, *id.* (emphasis added), FERC's point of comparison was the period "[s]ince the issuance of Order No. 472, in 1987," during which "the industry ha[d] undergone sweeping changes," and "the nature of the work of the Commission likewise ha[d] changed." *Id.* at 31,842, 65 Fed. Reg. at 65,758. Notwithstanding the California crisis, and, indeed, FERC's commitment to "polic[ing] individual behavior in markets much more effectively than in the past," FY2002 Report at 6, we see no indication that the Commission's focus has returned to what it was before the 1990s.

Indeed, the very documents cited by MISO and NYISO—the annual reports and the SMD proposal—demonstrate that transmission reform remains a top priority. The FY2002 report, for example, stresses that the goal of "complet[ing] the transition to competitive energy markets as quickly and comprehensively as possible," *id.*—FERC's "primary emphasis," *id.* at 5—"furthers work on initiatives begun in the last couple years," presumably including the transmission-related orders. *Id.* at 6. Similarly, while the SMD initiative calls for a standardized market design, describing "[m]arket monitoring at all times, and market power mitigation when needed," as "critical pieces of this initiative," *SMD NOPR*, [Proposed Regs. 1999–2003] FERC Stats. & Regs. at 34,281, 67 Fed. Reg. at 55,455, it also proposes measures aimed at "remedy[ing] remaining undue discrimination" in transmission access—including "exercis[ing] jurisdiction over the transmission component of bundled retail transactions," modifying tariffs to offer "consistent transmission rules for all transmission customers," and mandating that transmission owners "contract with an independent entity to operate their transmission facilities." *Id.* In addition, the proposal sets out plans for a "congestion management system" designed to

"allocat[e] scarce transmission capacity" and "encourage long-term efficiency in the development of transmission, generation and demand response infrastructure." *Id.* at 34,282, 67 Fed. Reg. at 55,456. Given these ongoing efforts to reform the nation's transmission system, it would be premature to conclude on the basis of four highly unusual years that FERC no longer devotes itself "increasingly" to that goal.

As a fallback, the ISOs argue that FERC inadequately explained its denial of their petitions. *See Am. Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 7 (D.C. Cir. 1987) (holding that agency action was arbitrary and capricious where "the Secretary ha[d] not presented a reasonable explanation of his failure to grant the rulemaking petition"). It is true that FERC's principal rationale for denying new rulemaking—that it had "already considered and rejected" the petitioners' arguments, 103 F.E.R.C. at 61,179—makes little sense insofar as the ISOs were asserting a change in circumstances. Yet FERC went on to explain that "a primary focus of the Commission's efforts in reforming the western markets and a primary focus of the SMD NOPR [notice of proposed rule-making] is transmission," citing in particular FERC's plans, noted earlier, for "a revised open access transmission tariff that is intended to remedy remaining undue discrimination," and a "transmission congestion management system to ensure that public utilities manage the Nation's interstate transmission grid efficiently." *Id.* at 61,180. FERC also explained that "much of the Commission's efforts involving western markets go to whether public utilities have used transmission schedules and constraints to manipulate prices or exercise market power." *Id.* FERC's denial of the rehearing petition, while pledging that "the issues may merit further consideration at a later time and we will reevaluate whether a new rulemaking is warranted at that later time," stated that "[t]he thrust of the Commission's current work involves the regulation of transmission." 104 F.E.R.C. at 61,209. Though brief, these explanations easily satisfy FERC's limited burden of justification under our "highly deferential" standard of review. *Nat'l Customs*, 883 F.2d at 96.

In sum, finding neither evidence that a "significant factual predicate of [FERC's] prior decision on the subject ... has been removed," *WWHT*, 656 F.2d at 819, nor that FERC failed to draw "a rational connection between the facts found and the choice made," *id.* at 817 (internal quotations omitted), we decline to direct the Commission to reconsider Order No. 641.

## IV.

For federal agencies, as with mice and men, the best-laid plans often go awry. *See* Robert Burns, *To a Mouse, On Turning Her up in Her Nest with the Plough* (1785). We trust that FERC—as it has promised—will reconsider its system of charges if the resource-allocation assumptions underlying Order No. 641 prove false. At this early juncture, however, on the heels of a highly unusual four-year period and in the face of the Commission's continued efforts to reform transmission, we decline to override FERC's view of its own priorities and compel new rulemaking. Accordingly, we deny the petition for review.

*So ordered.*